## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **RANDY J. BOUDREAUX,** | **CIVIL ACTION** |
| **Plaintiff,** | |
| | **Case No. 2:19-cv-11962** |
| **v.** | |
| **LOUISIANA STATE BAR ASSOCIATION, et al.** | **SECTION "I" (1)** |
| **Defendants,** | **Judge Lance M. Africk** |
| | **Magistrate Judge Janis van Meerveld** |

## DEFENDANTS' AMENDED PROPOSED
## <u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

Defendants, the Louisiana State Bar Association ("LSBA") and, in their official capacities, the Justices of the Louisiana Supreme Court, through undersigned counsel, hereby submit the following proposed findings of fact and conclusions of law, which have been amended to include additional record citations.

# Table of Contents

I.     FINDINGS OF FACT..............................................................................................................3

   A.    History......................................................................................................................................3

   B.    Purpose and Structure .............................................................................................................3

   C.    Membership and Dues .............................................................................................................5

   D.    Objection Process.....................................................................................................................6

   E.    The LSBA assists the Louisiana Supreme Court with regulation of the practice of law and improvement of the quality of legal services. .........................................................................9

   F.    The LSBA's other activities and programming also regulate the practice of law and improve the quality of legal services. ...................................................................................................12

   G.    The Complaint .......................................................................................................................15

   H.    The LSBA's post-*McDonald* Changes...................................................................................18

   I.    The post-*McDonald* LSBA speech criticized by the Plaintiff (although not within the Complaint) ............................................................................................................................20

II.    CONCLUSIONS OF LAW ..................................................................................................23

   A.    Standing and Ripeness ...........................................................................................................23

   B.    Mootness................................................................................................................................27

   C.    Statute of Limitations.............................................................................................................29

   D.    The Eleventh Amendment .....................................................................................................30

   E.    The Tax Injunction Act ..........................................................................................................32

   F.    Precedent forecloses the Plaintiff's primary claim. ..............................................................33

   G.    The Plaintiff's alternative claim relative to criticized legislative activities fails because the activities (although now obsolete) were germane..................................................................33

   H.    The Plaintiff's new criticism of the Secret Santa notice fails because the notice was germane. ....34

   I.    The Plaintiff's new criticism of the Red Mass notice fails because the notice was germane. ........35

   J.    The Plaintiff's new criticism of the social media posts fails because the posts are germane. ........36

   K.    The Plaintiff's claims fail to meet *Lathrop*'s "major activity" requirement. ..................................37

   L.    In the alternative, the LSBA's *Hudson* safeguards are sufficient to remedy any alleged First Amendment violation.............................................................................................................40

III.   CONCLUSION......................................................................................................................43

## I.  FINDINGS OF FACT

### A.  History

1.      The LSBA is an "integrated" or "mandatory" bar association.

2.      The LSBA reflects approximately 100 years of trial-and-error relative to Louisiana bar associations.[1]

3.      Pre-integration, Louisiana was composed of voluntary bars that tended to be insular, protective of their educational resources, and presented barriers to a diverse profession.[2]

4.      The LSBA has existed since 1940, when the Legislature in Act No. 54 of 1940 "memorialized" the Supreme Court to exercise its power by creating the LSBA, imposing a mandatory membership requirement, and authorizing the collection of member dues.[3]

5.      The Louisiana Supreme Court then promulgated a charter by issuing a rule on March 12, 1941, creating the LSBA.[4]

### B.  Purpose and Structure

1.      The purpose of the LSBA is to promote and assist the regulation of the practice of law, improve the quality of legal services, advance the science of jurisprudence, promote the administration of justice, uphold the honor of the Courts and of the profession of law including

---

[1] Exh. 1, Warren M. Billings, "A Bar for Louisiana: Origins of the Louisiana State Bar Association," Louisiana History: The Journal of the Louisiana Historical Association, Vol. 41, No. 4 (Autumn, 2000), pp. 389-401.

[2] *Id.*; *see also* Testimony of Darrel Papillion ("Papillion") at 211:18-25 ("With respect to those [voluntary] associations, they really can't compare to the LSBA because the LSBA is a comprehensive association of all of the state's lawyers that works in close coordination with the Supreme Court to help regulate the practice of law and ensure quality legal services to the citizens of our state."); Testimony of Robert Kutcher ("Kutcher") at 155:22-24 (discussing the need for a statewide association).

[3] Exh. 2, La. R.S. 37:211 Reporter's Notes - 1950 (discussing Sections 2- 3 of Act No. 54 of 1940).

[4] *Id.*

Louisiana's civil law system, and, generally, to promote the welfare of the profession in the State.[5]

2.    The LSBA has five officers: President, President-Elect, Secretary, Treasurer, and Immediate Past President. The LSBA's five officers are selected by its members, and rotating nominating committee districts ensure that no particular geographic area dominates the leadership from year-to-year.[6]

3.    Certain LSBA affairs are administered by the Board of Governors (the "Board"), the composition of which includes representatives from different geographic districts. The Board's responsibilities now include commenting on germane legislation.[7]

4.    The House of Delegates ("HOD") is the LSBA's policy making body, and it includes 225 delegates, with representatives from each judicial district. Bar members in each district elect their delegates. The entire state, therefore, is represented in the HOD.[8]

5.    Previously, the HOD made legislative policies. Now, however, all HOD legislative policies in place prior to the filing of this action have been rescinded.[9] The HOD still can approve general policies and did so in January 2022.[10]

6.    All of the LSBA's elected officers, Board members, and delegates serve without compensation.[11]

---

[5] Exh. 3 La. S. Ct. Rule XVIII.

[6] Kutcher at 155:18-24; Exh. 4, LSBA Articles of Incorporation.

[7] Kutcher at 158:24-159:8; Exh. 4, LSBA Articles of Incorporation; Exh. 5 LSBA By-Laws.

[8] Kutcher at 153:21-25.

[9] *See* Testimony of Plaintiff Randy Boudreaux ("Boudreaux") at 48:15-16; 70:9-11 (conceding that the policies "are no longer in effect" and that the LSBA eliminated the Legislation Committee).

[10] Kutcher at 159:9-23; Exh. 6, January 2022 draft minutes considering HOD Resolutions; Exh. 56, Bar Governance Committee Resolution Adopting Germane Policies adopted in January 2022.

[11] Kutcher at 155:25-156:2; Exh. 4, LSBA Articles of Incorporation.

### C.   Membership and Dues

1.      As of August 2021, the LSBA had more than 22,000 members.[12]

2.      The LSBA does not require its members to participate in any of its activities.[13]

3.      The LSBA acts to organize and marshal efforts to improve the profession statewide, and it is generally known that the LSBA's membership consists of varying and frequently divergent viewpoints.[14]

4.      Lawyers are free not to attend, participate and/or to speak against any LSBA activity.[15]

5.      The LSBA posts disclaimers on its website, in the *Bar Journal*, in its CLE marketing materials, and in its annual registration and dues documents. These disclaimers make clear that it does not speak on behalf of all of its members.[16]

6.      The LSBA's annual dues are authorized by Order of the Louisiana Supreme Court pursuant to the 1940 legislative memorial.[17]

7.      Pursuant to Louisiana Supreme Court Rule ("LSCR") 1.1(c), Louisiana attorneys must pay LSBA dues to maintain eligibility to practice law. Annual dues are $80-200, depending on how long a member has been admitted to practice law. Members admitted for 50 years or more

---

[12] Pretrial Order (Doc. 83), Uncontested Statement of Facts ("Stip."), ¶ 7(i).

[13] Stip., ¶ 7(j); Boudreaux at 92:16-93:2 ("Q.  So the only compelled behavior is the requirement that you pay dues?  A.  Membership and paying dues, yes.").

[14] *E.g.*, Boudreaux at 84:6-19, 92:12-15 ("Q.  And if you see something on the LSBA website, you do not conclude that every lawyer in Louisiana agrees with that position, correct?  A. Correct.").

[15] Boudreaux at 92:16-93:2.

[16] Testimony of Loretta Larsen ("Larsen") at 175:7-20; Exh. 9, Disclaimers; *see also* Testimony of Kelly Ponder ("Ponder") at 145:14-16 (After *McDonald*, the LSBA redoubled its efforts to make sure the disclaimers were visible.).

[17] Stip., ¶ 7(m).

and inactive members need not pay dues. The Board of Governors has authority to waive dues for members experiencing dire circumstances such as illness or financial hardship.[18]

8.      LSBA dues are due on July 1st of each year.[19] On or after August 1st, members in default of payment are given a delinquency notice advising that they have an additional 30 days in which to pay or they will be certified as ineligible; if a member fails to pay dues within this 30 days, he or she ceases to be in good standing and the LSBA Treasurer certifies to the Louisiana Supreme Court that the delinquent member is ineligible to practice law.[20]

9.      Members are advised of the LSBA's activities via email, the *Bar Journal*, the LSBA's website, and through social media posts.[21]

10.     Members are advised of LSBA's budget and expenditures through the publication of audited financial statements.[22]

11.      In addition, after *McDonald v. Longley*, the LSBA decided to begin publishing prospective budget information. Thus, in May 2022, the LSBA published its draft budget expenditures for 2022-23.[23]

**D.    Objection Process**

1.      The LSBA publishes audited annual reports each year providing information on its use of mandatory dues and other revenue.[24] The LSBA also published its draft budget

---

[18] Exh. 7, By-Laws, art. I, §§ 3-4, Delinquent Dues.

[19] The Plaintiff confirmed that he would pay his dues in June. *See* Boudreaux at 11:3-5.

[20] Larsen at 172:24-173:18; Exh. 7, By-Laws, art. I, §§ 3-4, Delinquent Dues.

[21] Exh. 72, Exhibit 13 to Deposition of Randy Boudreaux; Exh. 64, Sample E-mail; Exh. 26, Sample Bar Brief; Exh. 65, Sample Facebook Post; Exh. 66, Sample Twitter Posts; Exh. 67, Sample Instagram post.

[22] Exh. 58, Audited Annual Financial Statements.

[23] Exh. 73, May 2022 Financial Disclosure.

[24] Larsen at 184:16-20; Exh. 58, Audited Annual Financial Statements.

expenditures for 2022-23.[25] Bar activities are published to members through multiple sources, including the LSBA website, emails to LSBA members, the *Louisiana Bar Journal*, Bar Briefs, Facebook, Twitter, and Instagram.[26] The LSBA also routinely publishes and promotes non-legislative activity, such as CLEs.[27]

1.      The LSBA's By-Laws require that the adoption of legislative positions be timely published in a regular communications vehicle with electronic notice to association members.[28] The notice of adoption of legislative positions is sent to members via emailed "Bar Briefs" at the same email addresses kept on file for purposes of service.[29] The Bar Briefs contain a prominent notice of the adoption of positions on bills.[30] Members can easily access details as to the legislative positions by clicking on a link or by directly visiting the LSBA website.

2.      Members need not decide at the onset of the year whether they believe the LSBA will engage in germane activity; they are kept informed and updated throughout the year and given an ongoing opportunity to object.[31] Members have 45 days after the notice is published to submit a written objection.[32]

---

[25] Larsen at 187:18-188:2; Exh. 73, May 2022 Financial Disclosure.

[26] Ponder at 141:8-14; Exh. 64, Sample E-mail; Exh. 26, Sample Bar Brief; Exh. 65, Sample Facebook Post; Exh. 66, Sample Twitter Posts; Exh. 67, Sample Instagram post; *see also* Ponder at 145:20-146:2 (explaining that, although Louisiana has only approximately 23,000 attorneys, the Bar Briefs newsletter has approximately 35,000 subscribers because individuals like legal staff members may voluntarily subscribe to it and, in doing so, assist attorneys in staying up-to-date on relevant information).

[27] Larsen at 177:15-17; Exh. 69, Sample CLE Notice.

[28] Exh. 5, LSBA By-Laws.

[29] Ponder at 146:6-9; Exh. 26, Sample Bar Brief.

[30] Exh. 26, Sample Bar Brief.

[31] Larsen at 173:22-174:19.

[32] Larsen at 174:9-12; Exh. 60, LSBA By-Laws, Art. XII, § 1.

7

3.      If a member objects to legislative activity, his or her refund amount is calculated *pro rata* based on all of the LSBA's legislative activity.[33] In other words, the potential refund amount is not limited to only the bill or bills to which the member specifically objects.

4.      Once an objection is filed, the *pro rata* amount of the objecting member's dues devoted to the challenged activity is promptly placed in escrow while the Board determines whether to grant a refund based on the objection.[34] Within 60 days, the Board either provides a *pro rata* refund or refers the matter to arbitration.[35] If an objection is to be arbitrated, a panel of three arbitrators is constituted as soon as is practicable, with the objecting member selecting the first arbitrator, the LSBA Executive Committee selecting the second, and the third arbitrator selected by agreement of the first two arbitrators.[36]

5.      Any member who objects to the use of any portion of the member's bar dues for a cause that he or she believes to be non-germane may file an objection.[37] Historically, all timely objections have resulted in refunds.[38]

6.      The Plaintiff has never attempted to use LSBA's *Hudson* procedures or (outside of this lawsuit) complained directly to the LSBA about a lack of notice for the LSBA's activities.[39]

---

[33] Larsen at 174:13-15; Exh. 61, 2020 Objection Refund Charts.

[34] Exh. 60, LSBA By-Laws, Art. XII, § 1.

[35] *Id.*

[36] *Id.*

[37] Larsen at 174:3-4; Exh. 59, 2022 *Hudson* Notice; Exh. 60, LSBA By-Laws, Art. XII, § 1.

[38] Larsen at 174:23-175:2.

[39] Boudreaux at 25:20-26:4 (explaining that he would not engage in a *Hudson* objection process because he would have to "take the time out of my day" to do so); 73:21-74:4; 75:19-23; Stip., ¶¶ 7(s-t).

E.   **The LSBA assists the Louisiana Supreme Court with regulation of the practice of law and improvement of the quality of legal services.**

1.   The LSBA and the Louisiana Attorney Disciplinary Board ("LADB") both assist the Louisiana Supreme Court in regulating the practice of law,[40] but they do so in different ways.

2.   The LADB is a statewide agency that administers Louisiana's lawyer discipline and disability system by investigating complaints of attorney misconduct and making discipline recommendations to the Louisiana Supreme Court.

3.   The LSBA assists the Supreme Court in regulating the practice of law through rules and orders that assign various regulatory functions and tasks to the LSBA and otherwise promoting the ethical practice of law.[41]

4.   The LSBA plays an integral part in the administration of the Louisiana Supreme Court's rules for lawyer advertising. Louisiana Supreme Court Rule 7.7 delegates the advertising registration and review process to the LSBA's Rules of Professional Conduct Committee. The Committee issues advisory opinions on advertising, maintains a searchable database of

---

[40] *See* Testimony of Sandra Vujnovich ("Vujnovich") at 194:12-15 ("Q.  Does the LSBA assist the Louisiana Supreme Court in regulating the practice of law? A.  Absolutely. The court designates a lot of its responsibility to the LSBA, and really could not fulfill all of its responsibilities to regulate the practice of law without the LSBA."); *see also id.* at 193:14-194:5 (Ms. Vujnovich has been employed by the Court since 1995, and her current position is Judicial Administrator. The Court authorized Ms. Vujnovich to appear as a witness.); Larsen at 191:16-23 ("Q.  In your 31 years as Executive Director, has the LSBA always worked closely with the Louisiana Supreme Court? A.  We always have, yes.  Q.  Has there been an instance that you can recall where the LSBA did not act in accordance with the wishes of the Louisiana Supreme Court relating to the regulation of the practice or improving the quality of legal services?  A.  Never.").

[41] *See* Vujnovich at 208:10-14 ("If the Bar did not do what it does to help the court, the court could not get those functions done right now under the present system. And I know the—the court relies on the Bar and, in fact, considers it a partner in the area of lawyer regulation."); *see also, e.g.*, Vujnovich at 202:5-206:15 ("Rule 19 is the rule of the Louisiana Supreme Court that sets out the lawyer discipline system in Louisiana," and it incorporates the LSBA into the disciplinary system no fewer than nine times.).

advertisements, and has a responsibility to refer non-compliant ads to disciplinary authorities.[42]

5.      Louisiana Supreme Court Rule 30 assigns the LSBA the responsibility of administering MCLE. The MCLE Committee includes six attorneys appointed by the LSBA and three attorney or judges appointed by the Court, and is responsible for enforcement of the MCLE rules, promulgating regulations on reporting, establishing quality assurance for CLE programs and reporting to the Court and the Bar on the status of CLE within the state.[43]

6.      The Board of Legal Specialization regulates and administers all matters pertaining to certified areas of specialization within the practice of law and regulating the certification of lawyers as board-certified specialists.[44]

7.      The Louisiana Supreme Court delegates functions to an LSBA-maintained standing committee on the Rules of Professional Conduct. The Committee also monitors developments in legal ethics, reviews legal ethics issues referred to it by the Court, and supervises an Ethics Advisory Service that publishes advisory opinions on inquiries submitted by lawyers.[45]

8.      The Court and the LSBA maintain an eligibility list of lawyers to practice law. The LSBA keeps track of approximately 22,000 attorneys, including their official contact information, dues payments, and satisfaction of CLE requirements. The Supreme Court and the LSBA issue Certificates of Good Standing.[46]

9.      The Louisiana Supreme Court and LSBA also jointly participate in the Access to

---

[42] Larsen at 176:3-11; Vujnovich at 194:22-195:5; Exh. 10, Lawyer Advertising Website.

[43] Vujnovich at 195:11-196:24; Exh. 11, MCLE Website.

[44] Vujnovich at 196:25-198:2; Exh. 12, Plan of Legal Specialization Website; Exh. 13, Public Resources, Board of Legal Specialization Website.

[45] Vujnovich at 198:3-23; Exh. 14, Rules of Professional Conduct Committee Website; Exh. 15, Ethics Advisory Service Website.

[46] Vujnovich at 199:15-20; Exh. 16, Member Directory Search Page; Exh. 20, La. S. Ct. Rule XIX.

Justice Commission established by the Court in 2015, which facilitates the work of legal-service providers to needy Louisiana citizens who require assistance with Access to Justice.[47]

10.     With the authority of the Louisiana Supreme Court, the LSBA created the Practice Assistance and Improvement Program, which includes the Attorney-Client Assistance Program[48] and Diversion Program. The Diversion Program is coordinated by the LSBA's Practice Assistance Counsel and can include participation in LSBA Ethics School and Trust Accounting School. These programs are "alternatives to discipline," part of the disciplinary diversion process, and are recognized within the Supreme Court Rules on Discipline.[49]

11.     The LSBA also implements the Transition into Practice Program. This program matches one mentor with one mentee, allowing more experienced attorneys to share their knowledge with beginning lawyers. The Louisiana Supreme Court expressly relied on that program in 2020 when the Bar Exam was impacted by the COVID-19 pandemic.[50]

12.     The LSBA also assists the Louisiana Supreme Court with managing and regulating the practice of law in the aftermath of disasters. The two have worked together in response to hurricanes, flooding, and the pandemic.[51]

---

[47] Vujnovich at 199:21-200:10; 200:23-201:12; Exh. 17, Access to Justice Commission Website; Exh. 18, Order Creating Access to Justice Commission.

[48] *See* Papillion at 215:25-216:10 (The Office of Disciplinary Counsel "remains intimately involved in the Client Assistance Program . . . . [I]t's a very important partnership, I would call it.").

[49] Larsen at 176:4-11; Vujnovich at 201:13-23; Papillion at 214:23-215:5; Exh. 19, Practice Assistance and Improvement Program Website; Exh. 20, La. S. Ct. Rule XIX.

[50] Larsen at 181:4-182:3; Exh. 21, TIP Website, referencing Supreme Court Order.

[51] Vujnovich at 206:16-207:25; Papillion at 212:1-21; Exh. 21, TIP website, referencing Court Order; *see also* Papillion at 212:3-21 (In the aftermath of "catastrophic flooding" in August of 2016, there were "many, many lawyers, staff courthouses, where we could not deliver legal services, and it was essential for the LSBA to work with local courts, to work with the Supreme Court. We worked with all three U.S. District Courts in our state to help provide information to lawyers, to the public and to do the best that we could in a very difficult and challenging

**F.    The LSBA's other activities and programming also regulate the practice of law and improve the quality of legal services.**

1.      The LSBA's committees assist with bar services and concerns, including access to justice, alcohol and drug abuse, bar governance, children's law, continuing legal education, public information, transitioning lawyers, and the unauthorized practice of law.[52]

2.      The LSBA maintains a broad and inclusive section structure on substantive law. This section structure promotes education and practice improvement across 30 sections that target specific fields of law.[53]

3.      The LSBA provides mediation and arbitration services through its Lawyer Dispute Resolution Program. This program was created to provide quick, low cost, and confidential solutions to fee disputes between clients and attorneys and fee disputes solely between attorneys.[54]

4.      The LSBA's official publication, the *Louisiana Bar Journal*, reaches every attorney and judge in the state—more than 22,000 subscribers. The *Bar Journal* contains articles of interest to attorneys and LSBA news.[55]

5.      The LSBA publishes an online newsletter, Bar Briefs, six times per year. Publication is online and through emails to subscribers. In total, the newsletter has more than 35,000 subscribers.[56]

---

time. . . . We [also] provided some assistance and worked in coordination with the office of the governor with respect to proclamations and emergency orders during that time as well.").

[52] Testimony of H. Minor Pipes, III ("Pipes") at 111:2-11; Exh. 22, Committee Preferences/List of Committees; Exh. 23, Committee Descriptions.

[53] Pipes at 111:12-20; Exh. 24, List of Sections/Section Application.

[54] Larsen at 176:15-177:12; Exh. 25, Lawyer Fee Dispute Resolution Website; Exh. 31, Lawyer Dispute Resolution Program Rules.

[55] Larsen at 184:18-20; Ponder at 141:8-11; Exh. 9, Disclaimers.

[56] Ponder at 145:17-19; Exh. 26, Sample Bar Brief.

6.      The LSBA operates a Continuing Legal Education ("CLE") program, a focal point of Bar programming. Sixty-six CLE seminars and webinars were presented in 2021. The LSBA offers live, remote, and pre-recorded CLE programming. The revenue from the CLE program offsets LSBA expenses by providing additional funding for the LSBA apart from mandatory dues.[57]

7.      The LSBA appoints the Board and provides funding for the Judges and Lawyers Assistance Program ("JLAP"). JLAP is a comprehensive mental health and wellness assistance program. JLAP provides direct and confidential assistance to law students, lawyers, and judges with a variety of issues including substance abuse, aging, and mental health issues.[58]

8.      The LSBA operates a member insurance program that is administered by Gilsbar. This program provides peer-reviewed access to business insurance solutions, including professional malpractice insurance. Overall, it provides LSBA members, their colleagues, staff, and families with high quality coverage.[59]

9.      The LSBA's Client Assistance Fund can reimburse clients up to $50,000 for money or property lost due to a lawyer's dishonesty.[60]

10.     The LSBA offers several free resources to assist members of the public in finding legal assistance. These resources include the member directory, the "modest means" directory (attorneys who charge reduced fees based on client income), and a directory of other resources

---

[57] Larsen at 177:23-178:1; Exh. 27, Sample CLE Calendar.

[58] Larsen at 180:22-181:3; Pipes at 112:11-115:8; *id.* at 113:11-21 ("[A] huge percentage of the lawyers that go into the disciplinary system" have mental health or substance abuse issues, and JLAP is intended to keep people out of the disciplinary system.); Exh. 28, JLAP Website.

[59] Papillion at 213:10-214:22; Exh. 29, Insurance Website.

[60] Papillion at 214:23-215:5; Exh. 32, Client Assistance Fund Website.

such as the ABA's free legal answers program, free online self-help centers, and court forms.[61]

11.    The LSBA focuses on increasing diversity and inclusion in the legal profession to bring more varied perspectives, experiences, backgrounds, talents and interests to the practice of law and the administration of justice.[62] The LSBA's Diversity Committee works to identify barriers to diversity in the legal profession and proposes methods and programs by which the LSBA can remove those barriers and achieve greater diversity. As part of the LSBA's efforts, the Pipeline to Diversity[63] and Outreach Subcommittee coordinates programs and encourages diversity efforts within the judiciary and law firms. Additionally, the Conclave on Diversity in the Legal Profession is designed to encourage a discussion among judges and attorneys about diversity and inclusion issues arising within the profession.[64]

12.    The LSBA provides a membership directory that allows the public to confirm a lawyer's eligibility to practice law.[65]

13.    The LSBA allows the public to review a lawyer's advertising through its Lawyer Advertising Filing Search.[66]

---

[61] Larsen at 178:18-179:3; Exh. 41, Pro Bono Website; Exh. 33, Pro Bono/Lawyer Referral Website.

[62] *See also* Kutcher at 160:6-19 (*McDonald* confirms that the LSBA may continue to address diversity within the legal profession.).

[63] *See* Papillion at 219:1-8 ("Many of these young people without a program like this would not—they don't necessarily all know lawyers, or have a lawyer in their family, and so this gives them an exposure to our profession, and, I believe, it's—quite clear that the increase of lawyers from different backgrounds, and different family circumstances, and life experiences, increases the quality or enhances the quality of legal services because those lawyers can better relate to the citizenry who form the clients of our members.").

[64] Papillion at 216:15-219:10; Exh. 34, Diversity Committee Website; Exh. 35, Pipeline to Diversity and Outreach Subcommittee Website.

[65] Larsen at 182:4-8; Exh. 16, Member Directory Search Page.

[66] Larsen at 182:9-21; Exh. 10, Lawyer Advertising Website.

14.     The LSBA provides the public with information on the LSBA Client Assistance Fund, the Attorney-Client Fee Dispute Resolution Program, and the process for filing a disciplinary complaint against an attorney through its Guide to Attorney Discipline Procedures in Louisiana.[67]

15.     The LSBA provides consumer brochures prepared by the Public Information Committee to give the public an overview of the pertinent principles in areas of law such as automobile insurance, divorce, and bankruptcy. Some of the brochures are available in both English and Spanish.[68]

16.     The LSBA provides a Disabilities Assistance Network to assists individuals with disabilities and those who have disability-related legal issues in finding attorneys with experience in, or a willingness to assist with, disability-related legal issues.[69]

17.     The LSBA provides funding to the Louisiana Center for Law and Civic Education, which brings lawyers, judges, and educators together to present on topics in the areas of civics or law-related instruction.[70]

**G.   The Complaint**

1.     The Plaintiff has been a member of the LSBA since 1996 and continues to be a member in good standing.[71]

2.     He has paid his dues to the LSBA each year from 1996 to the present and has not

---

[67] Larsen at 176:14-177:12; 179:4-9; Papillion at 214:23-215:5; Exh. 36, Guide to Discipline Website.

[68] Exh. 39, Brochure Overview Website.

[69] Larsen at 180:2-10; Exh. 40, Disability Assistance Network Website.

[70] Larsen at 180:11-17; Exh. 42, LCLCE Website.

[71] Boudreaux at 9:4-6; 71:22-72:1.

submitted any objection to paying dues or to any other LSBA activity prior to this lawsuit.[72]

3.　　　To his best recollection, the Plaintiff has not participated in any LSBA activities apart from the payment of his mandatory dues.[73]

4.　　　The Plaintiff is unaware of any instance in which he has been criticized individually for an activity of the LSBA.[74]

5.　　　Nonetheless, the Plaintiff contends that mandatory membership in and the payment of dues to the LSBA violates the First Amendment.[75]

6.　　　The Plaintiff's primary claim is that mandatory bar membership and dues are unconstitutional regardless of whether the LSBA's activities are germane or non-germane (the "primary claim").[76]

7.　　　The Plaintiff argues in the alternative that the LSBA engages in non-germane conduct that renders his mandatory membership and dues unconstitutional (the "alternative claim").[77]

8.　　　The Complaint contains three counts:

　　　a.　　"Compelled membership in the LSBA violates attorneys' First and Fourteenth Amendment rights to free association and free speech."[78]

　　　b.　　"The collection and use of mandatory bar dues to subsidize the LSBA's speech,

---

[72] Plaintiff's Objections and Responses to RFAs at 2.

[73] *Id.* at 12; Stip., ¶ 7(k).

[74] Boudreaux at 92:8-15 (testifying that "no one has ever told [him] they believed [he was] personally associated with anything they saw in the LSBA website" and that he does not personally associate anything on the LSBA website with other attorneys); *id.* at 84:6-19.

[75] *Id.*; Complaint (Doc. 1), ¶¶ 72-73.

[76] Complaint (Doc. 1), ¶¶ 78, 87.

[77] Complaint (Doc. 1), ¶¶ 88-89.

[78] Complaint (Doc. 1) at 13.

including its political and ideological speech, violates attorneys' First and Fourteenth Amendment rights to free speech and association."[79]

c. "The LSBA violates attorneys' First and Fourteenth Amendment rights by failing to provide safeguards to ensure mandatory dues are not used for impermissible purposes."[80]

9.    The parties have stipulated that the only activities criticized by the Plaintiff for purposes of this case are the ones identified in the Plaintiff's Complaint, discovery responses, and motion for preliminary injunction.[81]

---

[79] Complaint (Doc. 1) at 15.

[80] Complaint (Doc. 1) at 17. Although the Complaint *alleges* that the LSBA's notice process is deficient, despite extensive discovery, at trial the Plaintiff did not identify any non-germane activity to which he was unable to object because of a deficiency in the LSBA's *Hudson* procedures. *See, e.g.*, Boudreaux at 75:16-18 (conceding that he knew how to identify the LSBA's legislative positions, if he was interested in doing so), 91:24-95:2 ("Q.  And you would agree that through the *Bar Briefs* and through the LSBA website you can find any legislative position that the LSBA has taken, correct?  A.  Correct."); Stip., ¶ 7(w) ("Mr. Boudreaux does not dispute that he received email notices of the publication of Bar Briefs potentially at issue in this litigation."); Ponder at 146:6-9 (Bar Briefs notified members of legislative positions.); Exh. 26, Sample Bar Brief. Further, although the Plaintiff noted that he was unable to identify the precise amount of the LSBA's former lobbying budget attributable to a particular bill, Ms. Larsen confirmed that members who objected to any legislative position received a refund of the percentage of their dues attributable to all lobbying. *See* Boudreaux at 29:24-3; Larsen at 186:24-187:17 ("They could have objected to one position or every position that we took, and they received the full refund based on our total lobbying expenditures.").

[81] *See, e.g.*, Pretrial Order (Doc. 83), ¶ 7.dd. The Plaintiff's exhibit list also includes many pages of documents relative to activity beyond the stipulation of criticized conduct. *E.g.*, Plaintiff's Exhibit 61 ("The History & Traditions of Black Sororities and Fraternities"). Insofar as the Plaintiff attempts to expand his criticisms at trial to include evidence or argument relative to activity that was *not* identified in the Complaint, discovery responses, and motion for preliminary injunction, the Defendants objected at the start of the trial and made the objection continuing. Further, the extent to which the Plaintiff intends to focus on issues raised for the first time in a reply brief (relative to the motion for preliminary injunction) is unclear. Insofar as the Plaintiff argues claims not included in the Complaint, the Defendants have maintained their objection at trial. *See* Defendants' Request for Standing Objection (Doc. 93).

10.     The Complaint criticizes 25 prior legislative positions and former HOD Policies, which are listed in Appendix A (and the defenses to which are set forth in Appendix B). The Plaintiff must concede that the vast majority of these are time-barred and cannot support an independent cause of action under 28 U.S.C. § 1983.

## H.     The LSBA's post-*McDonald* Changes[82]

1.     On July 8, 2021,[83] the LSBA Board of Governors, using the emergency authority granted to it in its By-laws, voted to suspend the then-existing Legislation Committee of the LSBA and all legislative activities until the House of Delegates convened for its January 2022 meeting.[84]

2.     After *McDonald*, the Louisiana Supreme Court adopted Rule XVIII, § 6.[85] That rule codifies the constitutional germaneness standard and shifts responsibility for legislative policy and positions from the Legislation Committee and House of Delegates respectively to the Board of Governors. Accordingly, the House of Delegates (and the Legislation Committee) are no longer responsible for the LSBA's legislative policy positions and advocacy, if any. Instead, the Board of Governors is the sole LSBA entity that can perform such functions, and its activities

---

[82] *See* Kutcher at 151:3-12, 169:9-20 (explaining that while *Lathrop* indicated that perhaps a bar could engage in lobbying on substantive legislation on topics such as "curtesy and dower," *McDonald v. Longley*, 4 F.4th 229 (5th Cir. 2021), provided significance guidance by holding that a bar should not take positions on substantive legislation (subject to limited exceptions)) (discussing *McDonald*, 4 F.4th at 247-48 & 248 n.23).

[83] *See* Kutcher at 150:17 (The LSBA "acted very quickly. I mean, understand this opinion came out on a Friday afternoon, July 4th weekend, and [by] July 8th, the Legislation Committee was suspended."); *id.* at 151:14-18 (The LSBA took immediate action after *McDonald* without waiting to see whether the Texas Bar would seek en banc or Supreme Court review.).

[84] Pipes at 123:9-17; Kutcher at 150:13-21; 153:7-10; Exh. 51, Website Notice of Suspension of Legislation Committee, July 8, 2021; Minutes Reflecting Suspension; Exh. 52, Website Notice on Status of Integrated Bar Challenges.

[85] *See* R. Doc. 64 (Notice of Louisiana Supreme Court Rule Change).

are limited to constitutionally germane topics such as those identified as appropriate in *McDonald*.[86]

3.      The LSBA has amended its By-Laws, rescinded the criticized House of Delegates legislative policies, and eliminated the Legislation Committee. *See* R. Doc. 71 (Notice of Adoption of LSBA Resolutions Implementing Louisiana Supreme Court Rule XVIII, § 6).[87]

4.      The Louisiana Supreme Court Rules and the LSBA By-Laws currently allow the LSBA to engage in legislative advocacy, but Rule XVIII, § 6 and the LSBA By-Laws ensure that any such advocacy will be limited to avoid litigation relative to germaneness. The LSBA has not engaged in any legislative advocacy since *McDonald*.[88]

5.      The draft budget expenditures for 2022-2023 confirm that the LSBA is no longer paying for a lobbyist.[89]

---

[86] Kutcher at 153:7-10; Exh. 3, La. S. Ct. Rule XVIII; *see also* Kutcher at 150:4-17 (explaining why the shift in responsibility will make a difference in legislative activity, and confirming that the Board of Governors passed the post-*McDonald* resolutions unanimously).

[87] Pipes at 110:3-15; Kutcher at 125:18-25; Exh. 53, Board of Governors Minutes and Resolution Regarding Rule XVIII, Section 6; Exh. 54, Bar Governance Committee Resolution Regarding By-Laws Revisions (Doc. 71-1); Exh. 55, Bar Governance Committee Resolution Proposing to Rescind Legislative Policy Positions (Doc. 71-2). Although the House of Delegates no longer maintains legislative policy provisions, it concurrently passed several general (i.e., non-legislative) policy provisions. *See* Kutcher 158:19-21. The policy provisions relate to attorney-client privilege and work product, the taxation of legal services, access to justice through pro bono services, compensation for members of the state judiciary, the unauthorized practice of law, and diversity within the legal profession. *See* R. Doc. 71-3 (new general policy positions). The Plaintiff concedes that the principles underpinning these positions are germane. *See* Boudreaux at 77:5-79:5.

[88] Pipes at 129:23-130:1; Kutcher at 167:7-15.

[89] Larsen at 189:17-190:1; Kutcher at 165:16-166:6; Exh. 73, May 2022 Financial Disclosure. The draft budget reflects that the LSBA anticipates spending approximately $10,000 to monitor for legislation that would be germane under *McDonald* and within the scope of the standards set by Rule XVIII, § 6.

I. **The post-*McDonald* LSBA speech criticized by the Plaintiff (although not within the Complaint)**

1.      After *McDonald*, the Plaintiff pivoted from criticizing the legislative activity and HOD Policies that are listed in his Complaint to criticizing unrelated activities, such as the LSBA's use of Twitter messages to promote its "wellness" initiatives.[90]

2.      The Plaintiff criticizes 18 Twitter and email messages, which are listed in Appendix A (and the defenses to which are set forth in Appendix C). Social media and email messages of any type are not mentioned in the Complaint. Although the Complaint vaguely alleges that the LSBA does not provide sufficient information about its activities, social media posts and email messages—by their very nature—are disclosed by LSBA.[91]

3.      The post-*McDonald* speech criticized by the Plaintiff generally fits within three topics: attorney wellness, Red Mass notice, and Secret Santa notice.[92]

4.      *Attorney Wellness*:

      a.   The LSBA used Twitter messages to raise awareness of attorney wellness issues.[93]

      b.   The LSBA promotes physical, mental, and emotional wellbeing as part of its commitment to promoting ethical practice and professionalism.[94]

---

[90] *See* Reply re Motion for Preliminary Injunction (Doc. 70) at 6-7; Plaintiff's Exhibit 5 Boudreaux Deposition Exhibit 16, at 7.

[91] Ponder at 141:11-14.

[92] In addition to criticizing Secret Santa, the Plaintiff also criticizes an analogous program ("Ween Dream"), through which volunteers donate Halloween costumes to needy children. Given that the only material difference is that one program occurs at Halloween, for ease of discussion, LSBA will refer collectively to both initiatives as "Secret Santa" programs.

[93] Ponder at 140:19-22; Exh. 45, Summary Exhibit (social media and email).

[94] *Id.*

      c.   The criticized Twitter messages include, e.g., the promotion of strategies for addressing nutrition, sleep deprivation, and anxiety.[95]

5.    Red Mass Notice:

      a.   The LSBA provided notice of the "69th Annual Red Mass" hosted by the St. Thomas More Catholic Lawyers Association through its Twitter account, in two posts made on September 27, 2021, and October 1, 2021.[96]

      b.   The Red Mass is an event open to all members of the legal profession, regardless of religious affiliation or lack thereof, that dates back to the Middle Ages and is celebrated in more than 25 cities throughout the United States.[97]

      c.   The Red Mass at issue was hosted by the St. Thomas More Catholic Lawyers Society without LSBA funding, and attendance was purely voluntary.[98]

      d.   Although the Red Mass and Memorial Exercises occurred on different dates in 2021, generally speaking, the Supreme Court holds its annual Memorial Exercises on the same date as the Red Mass. The Memorial Exercises take place at the Louisiana Supreme Court and honor members of the legal profession who have passed away. Attorneys can attend the Memorial

---

[95] Exh. 45, Summary Exhibit (social media and email); Appendix C.

[96] Boudreaux at 68:12-19; Exh. 45, Summary Exhibit (social media and email).

[97] Kutcher at 164:1-3; Boudreaux at 86:2-10; *The History of the Red Mass*, ST. THOMAS MORE SOC'Y OF SANTA CLARA CNTY., https://www.stthomasmoresantaclara.org/the-red-mass/history-of-the-red-mass/ (last visited May 31, 2022).

[98] Pipes at 118:13-25; Kutcher at 164:1-4; Exh. 48, Louisiana Supreme Court Red Mass 2021 Press Release.

Exercises regardless of Red Mass participation, and attorneys also can choose to attend neither one.[99]

6.    Secret Santa Notice:

    a.    The LSBA used a Twitter message and email to notify members of the opportunity to participate in a voluntary Secret Santa program.[100]

    b.    The Secret Santa Program is designed as a charity to provide anonymous holiday gifts to needy children at high risk of being involved in the legal system. Volunteers donate the gifts. The LSBA does not contribute gifts, and participation by LSBA members is voluntary. The majority of LSBA members do not participate.[101]

    c.    The "Ween Dream" Program is designed as a charity to provide anonymous gifts of Halloween costumes to needy children. Volunteers donate the costumes. The LSBA does not contribute funds or costumes, and participation by LSBA members is voluntary.[102] The majority of LSBA members do not participate.[103]

7.    The Plaintiff also criticizes two Twitter messages that do not fall squarely within these categories. The first is a Twitter message noting the publication of a third-party's article on

---

[99] Kutcher at 163:11-21; 164:1-4.

[100] Larsen at 183:11-184:9; Exh. 45, Summary Exhibit (social media and email).

[101] Pipes at 117:7-12; 118:3-8.

[102] Plaintiff concedes that "the Louisiana State Bar Association does not fund or sponsor the Red Mass," Boudreaux at 86:11-13, and that these "projects are purely voluntary" and the LSBA's "role in th[ese] projects is limited to advertising them and providing limited support staff." Boudreaux at 87:2-10.

[103] Pipes at 117:7-14; 118:3-8

Apple iOS upgrades, including using passwords to protect "Notes" taken on a cellular phone.[104] The second is a Twitter message noting the publication of a third-party's article on student debt issues.[105] These Twitter messages provide information on issues of interest to attorneys (including relative to confidentiality and career development) and enhance engagement and interest in the LSBA's social medial presence.[106]

## II.   CONCLUSIONS OF LAW

The Plaintiff argues primarily that compelled membership in the LSBA would violate his First Amendment rights even if the LSBA engaged in germane advocacy alone (the "primary claim"), and alternatively that compelled membership in the LSBA violates his First Amendment rights due to its allegedly non-germane activities (the "alternative claim"). Consistent with the Court's Order (R. Doc. 85), in addressing the following legal issues, both the primary and alternative claims are considered.

### A.   Standing and Ripeness

1.   The Plaintiff has standing to assert his primary claim—i.e., the claim based on bar

---

[104] Plaintiff's Exhibit 5 Boudreaux Deposition Exhibit 16, at 7; *see also* Pipes at 121:23-25 (Cell phone security is relevant to confidentiality and privilege.).

[105] *Id.*; *see also* Pipes at 121:2-18 (discussing how the pressure of student debt may cause attorneys to leave the profession or err in the manner in which they handle funds).

[106] *See* Papillion at 212:19-213:5 (explaining that social media is "absolutely critical" during disasters like the 2016 flooding because "we had so much going on so quickly, people had lost their homes. They were under water; they were displaced. And the—the benefit of social media is that it's portable, handheld, and information can be transmitted very quickly that way. And we were very fortunate to have robust social media platforms in the Bar, and among the members of the leadership of the Bar."); Ponder at 139:21-140:4 ("[F]or the social media aspect, we are also looking at lawyer engagement. We want our members to view our site. If we didn't post anything, but when the Court closed because of Ida; well, then we're kind of dead in the water, and no one even knows we're out there. So we want to engage our members, have them come to us, so when there are major, you know, natural disasters, they're already in tune to what we're posting, and they're engaged . . . .").

membership regardless of any non-germane conduct.[107] Moreover, that claim is ripe for determination. That claim requires little analysis, however, because it is squarely foreclosed by precedent, including *Keller* and *McDonald*, as explained below.

2.      The Plaintiff lacks standing to assert his alternative claim—i.e., the claim that the LSBA engages in non-germane conduct and that the LSBA's *Hudson* procedures are not a sufficient safeguard.

3.      "Most standing cases consider whether a plaintiff has satisfied the requirement when filing suit, but Article III demands that an 'actual controversy' persist throughout all stages of litigation." *Hollingsworth v. Perry*, 570 U.S. 693, 705 (2013). Although the Fifth Circuit ruled that the Plaintiff's *allegations*[108] supported the determination that he had standing at the inception of this lawsuit, subsequent developments have deprived the Plaintiff of standing at this late stage of litigation.

4.      *Stringer v. Whitley*, 942 F.3d 715, 720-21 (5th Cir. 2019), summarizes the standing requirements for a plaintiff seeking injunctive and declaratory relief:

> Because injunctive and declaratory relief "cannot conceivably remedy any past wrong," plaintiffs seeking injunctive and declaratory relief can satisfy the redressability requirement only by demonstrating a continuing injury or threatened future injury. That continuing or threatened future injury, like all injuries supporting Article III standing, must be an injury in fact. To be an injury in fact, a threatened future injury must be (1) potentially suffered by the plaintiff, not someone else; (2) "concrete and particularized," not abstract; and (3) "actual or imminent, not 'conjectural' or 'hypothetical.'" The purpose of the requirement that the injury be

---

[107] *See* Boudreaux at 15:13-16:16 (The Plaintiff's objection to mandatory membership is not necessarily related to the particular conduct of the LSBA.).

[108] The Defendants recognize that the U.S. Court of Appeals for the Fifth Circuit also ruled that the Plaintiff need not allege that he personally disagrees with the speech at issue. The Defendants respectfully reserve the right to re-urge the argument that the Plaintiff lacks standing to challenge activity with which he agrees (or with respect to which he takes no position) if this case is ever considered by the Fifth Circuit en banc or the U.S. Supreme Court.

> "imminent" is "to ensure that the alleged injury is not too speculative for Article III purposes." For a threatened future injury to satisfy the imminence requirement, there must be at least a "substantial risk" that the injury will occur.

(footnotes and citations omitted). The Plaintiff fails to meet this standard.

5.      As set forth above, after *McDonald*, the Louisiana Supreme Court issued Rule XVIII, § 6; the LSBA amended its By-Laws; and the LSBA repealed the HOD Policies to which the Plaintiff objected. The LSBA has not engaged in any legislative activity post-*McDonald* to which the Plaintiff objects. Further, and as discussed below, the Eleventh Amendment constrains this lawsuit to prospective relief.

6.      Given these developments, the Plaintiff's claim relative to non-germane legislative activity is purely hypothetical.[109] The gist of the Plaintiff's claim as it currently stands is as follows: (1) in conjunction with a hypothetical future legislative session, a hypothetical LSBA member may suggest that the LSBA take a hypothetical position on a hypothetical piece of legislation; (2) that hypothetical legislative position will be non-germane; (3) the Board of Governors will disregard Supreme Court Rule XVIII, § 6 and *McDonald* and will vote to adopt that hypothetical legislative position; and (4) the adoption of that position will violate the Plaintiff's First Amendment rights because the hypothetical notice provided by the LSBA relative to the hypothetical legislative position allegedly will not comply with the requirements of *Hudson* and *McDonald*.[110]

7.      The Plaintiff's proffered injury is therefore too speculative to support standing. *See*

---

[109] *See* Boudreaux at 16:20-23; 17:11 (characterizing his "philosophical injury" as one of "annoyance," rather than a "serious injury," "except to notions of fairness and freedom of association").

[110] Nevertheless, Plaintiff has conceded that in such a scenario he still "would be able to petition the Louisiana Supreme Court for some kind of relief to restrain the LSBA's activities." Boudreaux at 82:18-21.

*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992); *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 414 n. 5 (2013) ("[T]hreatened injury must be certainly impending to constitute injury in fact, and . . . allegations of possible future injury are not sufficient. . . . Plaintiffs cannot rely on speculation about the unfettered choices made by independent actors not before the court." (internal quotation marks, citations, and alterations omitted); *Friends of St. Frances Xavier Cabrini Church v. Fed. Emergency Mgmt. Agency*, 658 F.3d 460, 466 (5th Cir. 2011) ("Unless a party seeking a remedy can show direct injury, this court will deny standing.").

8.      Accordingly, even if the Plaintiff may have had standing at this lawsuit's inception, the Plaintiff now lacks standing to challenge the LSBA's legislative activities. *See also Stringer*, 942 F.3d at 721 ("Standing also does not follow from the conclusion that the injunctive relief sought by a plaintiff would prevent the plaintiff from suffering the same injury in the future, which is always true when a plaintiff seeks an injunction prohibiting a defendant from repeating an action that injured the plaintiff in the past.").

9.      It is conceivable that the Plaintiff could have filed a lawsuit seeking to enjoin the LSBA from posting Twitter messages about "wellness" initiatives based on the allegation that the Plaintiff personally objects to those messages, believes that they are non-germane, and has not been able to avail himself of *Hudson* procedures to seek relief—but that is not the lawsuit that the Plaintiff chose to file.

10.     For related reasons, the Plaintiff's alternative claim is not ripe.

11.     The Fifth Circuit has instructed:

A court should dismiss a case for lack of "ripeness" when the case is abstract or hypothetical. The key considerations are "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." A case is generally ripe if any remaining questions are purely legal ones; conversely, a case is not ripe if further factual development is required.

26

*Orix Credit All., Inc. v. Wolfe*, 212 F.3d 891, 895 (5th Cir. 2000) (quotation omitted).

12.     Pursuant to the ripeness inquiry, "Whether particular facts are sufficiently immediate to establish an actual controversy is a question that must be addressed on a case-by-case basis." *Id.* at 896. As set forth above, the facts relative to the Plaintiff's challenge of legislative activity—or, rather, the lack of any non-speculative facts—are entirely conjectural. Accordingly, the claim is not ripe.

13.     Finally, the Plaintiff lacks standing and his claims are not ripe relative to his criticism of now-obsolete HOD Policies. When these policies existed, their function was to provide potential general criteria by which the now-obsolete Legislative Committee could assess whether to take a position on legislation.[111] Insofar as the Plaintiff has a challenge to a legislative position, it is that actual position that the LSBA has taken—and not the notification to members of the criteria on which a position may be taken—that constitutes expressive conduct to which the Plaintiff can object. The HOD Policies by themselves, however, are not actionable speech—rather, they are a notification of potential future speech.[112] This provides an additional reason that the HOD Policy criticisms in this case are not justiciable.

**B.     Mootness**

1.     The Plaintiff's primary claim is not moot because he is required to be an LSBA member and pay dues if he wishes to practice law in Louisiana.

2.     The Plaintiff's alternative claim is moot because the LSBA conduct he challenges[113]—former legislative positions and now-rescinded Policies of the House of

---

[111] Kutcher at 161:13-17; Exh. 63, Prior Legislative Advocacy Website.

[112] Kutcher at 161:13-17 (The prior HOD legislative policies provided categories of topics on which the Legislation Committee might act or could act.).

[113] The LSBA maintains that its prior legislative positions were germane, although the issue has become merely an academic once since the underlying legislative policies have all been repealed

Delegates—occurred in the past and is not ongoing.

3.      Less than one week after the Fifth Circuit decided *McDonald v. Longley*, 4 F.4th

229 (5th Cir. 2021), the LSBA's Board of Governors voted to suspend the Legislation Committee

and all legislative activities until the House of Delegates could convene for its January 2022

meeting.[114]

4.      After the Fifth Circuit's decision in *McDonald*, the Louisiana Supreme Court

expressly amended its Rule 18, which governs the Louisiana State Bar Association, to add Section

6, which directly requires that the LSBA comply with the constitutional requirements expressed

in the *McDonald* decision.[115]

5.      At the January 2022 meeting, the House of Delegates approved resolutions to

(1) rescind all existing legislative policy positions; (2) revise the LSBA's by-laws "to more

accurately reflect current operating practices and remove outdated and obsolete provisions that

are no longer effective"; and (3) recognize that the LSBA is bound by Rule XVIII, § 6 and

suspend "any [LSBA] activity not within its scope, including but not limited to any action with

respect to legislative policy provisions previously adopted by the House of Delegates (which

provisions are now obsolete and no longer effective under the text of the Rule)."[116]

6.      The Court must presume that these "formally announced changes to official policy

---

and decision-making on any hypothetical future legislative positions is subject to strict procedural safeguards to avoid the need for any further litigation. Plaintiff admits that these policies "are no longer in effect." Boudreaux at 48:13-16.

[114] Kutcher at 153:7-10; Larsen at 189:20-22; Exh. 52, Website Notice on Status of Integrated Bar Challenges.

[115] Pipes at 128:1-5; Kutcher at 153:7-16; Exh. 3, La. S. Ct. Rule XVIII.

[116] Kutcher at 125:12-126:25; Exh. 53, Board of Governors Minutes and Resolution Regarding Rule XVIII, Section 6; Exh. 54, Bar Governance Committee Resolution Regarding By-Laws Revisions (Doc. 71-1); Exh. 55, Bar Governance Committee Resolution Proposing to Rescind Legislative Policy Positions (Doc. 71-2).

are not mere litigation posturing," *See Turner v. Tex. Dep't of Crim. Just.*, 836 F. App'x 227, 229

(5th Cir. 2020), *cert. denied*, 141 S. Ct. 2681 (2021), and the LSBA has more than carried its

burden of showing "that the challenged behavior cannot reasonably be expected to recur."

*Already, LLC v. Nike, Inc.*, 568 U.S. 85, 96 (2013).[117]

7.     While the LSBA maintains that its prior legislative positions were germane, this

issue is moot.

## C.    Statute of Limitations

1.     The Plaintiff's primary claim is not time-barred because he has been subject to

mandatory membership and dues within the last year.

2.     The Plaintiff's alternative claim is time-barred because the criticized activity

identified in the Complaint occurred more than one year before it was filed.

3.     The Complaint was filed on August 1, 2019, and alleges violations of 42 U.S.C. §

1983.

4.     "Section 1983 claims pending in federal courts in Louisiana are subject to a one

year statute of limitations period." *Gordon v. James*, No. CV 16-16540, 2017 WL 4311125, at *6

(E.D. La. Sept. 26, 2017) (Feldman, J.). "[T]he statute of limitations begins to run from the

moment the plaintiff becomes aware that he has suffered an injury or has sufficient information

to know that he has been injured." *Helton v. Clements*, 832 F.2d 332, 335 (5th Cir. 1987).

---

[117] *See e.g.*, Vujnovich at 209:7-12 ("Q.  In your 27 years at the court, are you ever aware of the LSBA ignoring a directive of the Louisiana Supreme Court?  A.  No, I am not.  Q.  Do you believe the LSBA will comply with Section 6 of Rule 18?  A.  Absolutely."); Pipes at 122:19-123:17 (As LSBA president, Mr. Pipes took action immediately after *McDonald* to ensure compliance.); Kutcher at 167:7-15 (The LSBA engaged in no legislative activity in 2022 "[b]ecause of *McDonald*, because of the Supreme Court amendment, because [the LSBA] changed [its] rules, because we are following the rules of the Fifth Circuit, and because [] nothing in the legislative session in this year [] fell within the parameters of existing policies established in January of 2022.").

5.      Through notices including Bar Briefs, electronic mail, and information posted on the LSBA's website, Plaintiff knew or had sufficient information to become aware of any alleged injuries more than one year prior to filing his Complaint.[118]

6.      The Complaint alleges that the LSBA engaged in non-germane speech through legislative activities and HOD Policies.

7.      The challenges to the LSBA legislative positions identified in Plaintiff's Complaint are untimely because each position was taken either during or prior to the 2018 legislative regular session.[119] The 2018 legislative regular session adjourned by June.[120]

8.      Similarly, the challenges to the HOD Policies identified in Plaintiff's Complaint are untimely because each policy was passed before August 1, 2018.[121]

9.      Thus, the Plaintiff's challenges to the legislative activity and HOD Policies identified in the Complaint are untimely. *See Schell v. Chief Just. & Justs. of Okla. Sup. Ct.*, 11 F.4th 1178, 1191-92 (10th Cir. 2021) (holding that the plaintiff could not challenge *Oklahoma Bar Journal* articles published, or legislative positions taken, more than two years before filing of the lawsuit because Oklahoma has a two-year statute of limitations for tort actions that applies to § 1983 claims in that state).

### D.   The Eleventh Amendment

1.      The Plaintiff's lawsuit relies on the *Ex parte Young* exception to Eleventh Amendment immunity.

---

[118] Boudreaux at 75:24-76:9; Exh. 72, Exhibit 13 to Deposition of Randy Boudreaux.

[119] Kutcher at 150:1-4; 76:5-9; Complaint (Doc. 1), ¶¶ 44-46 (identifying legislative positions taken between 2008 and 2018); Exh. 44, Summary Exhibit (legislative).

[120] Kutcher at 150:1-4.

[121] Complaint (Doc. 1), ¶¶ 40-44; Plaintiff's Exhibit 49.

2.      The Plaintiff's primary claim seeks relief properly characterized as prospective and, thus, within *Ex parte Young*. Accordingly, the Court retains jurisdiction over these claims. *See Green Valley Special Util. Dist. v. City of Schertz, Tex.*, 969 F.3d 460, 473 (5th Cir. 2020) ("But even if some of the relief sought is not available, it does not follow that *Young* bars Green Valley's entire suit. Because at least one form of prospective relief is possibly available to Green Valley, its claims against the PUC Officials are not barred by the Eleventh Amendment.").

3.      The Eleventh Amendment bars the Plaintiff's alternative claim relative to legislative advocacy because that claim is not prospective nor addressed to any alleged "ongoing violation."

4.      "In most cases, Eleventh Amendment sovereign immunity deprives federal courts of jurisdiction to hear private suits against states." *Freedom From Religion Found. v. Abbott*, 955 F.3d 417, 424 (5th Cir. 2020) (citation omitted). "The Supreme Court's holding in *Ex parte Young*, 209 U.S. 123 (1908), provides [an] exception. Under *Ex parte Young*, a litigant may sue a state official in his official capacity as long as the lawsuit seeks prospective relief to redress an ongoing violation of federal law." *Id.*

5.      "In order to determine whether relief is prospective as required under the *Ex parte Young* exception, the court should look to the 'substance rather than to the form of the relief sought,' and consider the policies underlying the decision in *Ex parte Young*." *Id.* at 425. "Merely requesting injunctive or declaratory relief is not enough; sovereign immunity does not turn entirely on the relief sought." *Green Valley Special Util. Dist.*, 969 F.3d at 471.

6.      When a declaratory judgment is "backwards-looking," it is "tantamount to an award of damages for a past violation of law, even though styled as something else." *Freedom from Religion Found.*, 955 F.3d at 425 (quotation omitted). Any argument that a court should grant

prospective declaratory relief to "clarify[] the contours of the First Amendment and deter[]" violations going forward fails as a matter of law because "compensatory or deterrence interests are insufficient to overcome the dictates of the Eleventh Amendment.'" *Id.* at 426 (quoting *Green v. Mansour*, 474 U.S. 64, 68 (1985)).

7.     Similarly, a claim for injunctive relief predicated solely on past conduct fails to meet *Ex parte Young*'s "ongoing violation" requirement. *Id.* at 425-26 (5th Cir. 2020) (citing *Green*, 474 U.S. at 68-69, for the proposition that "the Eleventh Amendment barred a claim for declaratory relief once the claim for injunctive relief was rendered moot").

8.     The Eleventh Amendment bars the Plaintiff's claim for a declaratory judgment on the LSBA's past lobbying activities. Any declaratory judgment on those claims would be impermissible retrospective relief. *See id.* at 424; *see also Hughes v. Johnson*, No. CV 15-7165, 2016 WL 6124211, at *4 (E.D. La. Oct. 20, 2016) (Vance, J.) ("In other words, plaintiffs seek declarations that Defendant Justices' *past* conduct violated federal law. These claims are therefore retrospective, and *Young* will not save them."). Further, the Plaintiff's argument that a declaratory judgment is necessary to guide the Defendants' future conduct fails because "deterrence" of future First Amendment violations is "insufficient to overcome the dictates of the Eleventh Amendment." *Freedom From Religion Found.*, 955 F.3d at 426.

9.     The Eleventh Amendment also bars the Plaintiff's claim for injunctive relief relative to lobbying. The criticized conduct has ceased. Accordingly, "to the extent the controversy is not simply moot[,] the claim is barred by Eleventh Amendment immunity." *Hughes*, 2016 WL 6124211, at *5.

### E.    The Tax Injunction Act

1.     The Defendants recognize that the U.S. Court of Appeals for the Fifth Circuit ruled

that the Tax Injunction Act does not apply to this lawsuit. The Defendants respectfully reserve the right to re-urge the argument that the Tax Injunction Act applies if this case is ever considered by the Fifth Circuit en banc or the U.S. Supreme Court.

**F.     Precedent forecloses the Plaintiff's primary claim.**

1.     The Plaintiff's primary claim is that the LSBA is unconstitutional even if it engages only in germane speech. The Fifth Circuit's decision in *McDonald v. Longley*, 4 F.4th 229 (5th Cir. 2021), squarely rejects this type of claim as foreclosed by Supreme Court precedent. Moreover, the U.S. Supreme Court has repeatedly denied petitions for certiorari that raise this same claim. *See McDonald v. Firth*, 142 S. Ct. 1442 (2022); *Schell v. Darby*, 142 S. Ct. 1440 (2022); *Crowe v. Or. State Bar*, 142 S. Ct. 79 (2021); *Jarchow v. State Bar of Wis.*, 140 S. Ct. 1720, 1721 (2020).

**G.     The Plaintiff's alternative claim relative to criticized legislative activities fails because the activities (although now obsolete) were germane.**

1.     All the legislative activities complained of by the Plaintiff are germane to improving the quality of legal services and regulating the practice of law.[122]

2.     The prior process for legislative activity ensured germaneness, but that process is now concluded and cannot support an injunction.[123]

3.     Most of the criticized HOD Policies were enacted prior to 2018. These policies

---

[122] Kutcher at 168:23-25; Exh. 43, Declaration of Robert A. Kutcher (Doc. 69-4); Exh. 44, Summary Exhibit (legislative); Exh. 46, Legislation Committee Video; Exh. 63, Prior Legislative Advocacy Website; *see also* Kutcher at 157:19-158:16 (*McDonald* and the passage of La. S. Ct. Rule XVIII, § 6 mean that, generally speaking, the LSBA is no longer authorized to take positions on immunities.); *id.* at 158:1-3 (Post-*McDonald*, it "would be pushing the envelope [too] far to say we're going to take a position on immunities now.").

[123] *Id.* at 166:12-24.

served as notice of the criteria LSBA used to assess whether to take a position on legislation.[124] As such, they were notice of potential speech, rather than speech itself.

4.      The criticized HOD Policies were germane,[125] but they have been rescinded. New general policies are germane under the standard articulated in *McDonald v. Longley*. 4 F.4th 229 (5th Cir. 2021).[126] And the new legislative process in place ensures germaneness.[127]

5.      The criticized legislative activities are germane for the reasons set forth in the Summary Exhibit.[128]

**H.   The Plaintiff's new criticism of the Secret Santa notice fails because the notice was germane.**

1.      The Secret Santa and Halloween costumes public-service initiatives are community service initiatives directed to low-income families.[129] Participation in these initiatives is voluntary

---

[124] Kutcher at 161:13-17 (The prior HOD legislative policies provided categories of topics on which the Legislation Committee might act or could act.).

[125] *E.g.*, Pipes at 126:2-127:13.

[126] *See also* Kutcher at 166:25-167:6 (Even assuming legislative activity came within the new policies, the Board of Governors still would have discretion to "look at the bill, make a determination and assess what position, if any, was appropriate to be taken.").

[127] Kutcher at 165:22-167:6; Pipes at 125:12-128:12; Exh. 3, La. S. Ct. Rule XVIII; Exh. 43, Declaration of Robert A. Kutcher (Doc. 69-4); Exh. 44, Summary Exhibit (legislative); Exh. 46, Legislation Committee Video; Exh. 54, Bar Governance Committee Resolution Regarding By-Laws Revisions (Doc. 71-1); Exh. 63, Prior Legislative Advocacy Website.

[128] *E.g.*, Kutcher at 168:23-25, 157:10-158:3 (explaining that, while the immunities positions were not substantive, hypothetical similar positions will not recur); 160:2-162:4 (explaining that, while the anti-discrimination policy occurred during a nationwide discussion about the relationship between anti-discrimination measures and the Rules of Professional Conduct, future hypothetical positions on discrimination, if any, will be limited to diversity in the profession); *see also*, *e.g.*, Exh. 44, Summary Exhibit (legislative).

[129] *See* Boudreaux at 87:16-19 (conceding that "engaging in charitable activities can be a way to improve professionalism among lawyers"); *see also* Louisiana Rules of Professional Conduct, Rule 6.1; *see also* Louisiana District Court Rules, Rule 6.2(k) ("Attorneys . . . should abide by the Louisiana Code of Professionalism"); Louisiana Code of Professionalism ("I will work to protect and improve the image of the legal profession in the eyes of the public"); Boudreaux at 60:10-11 (conceding, "You can enhance the image of lawyers and make it germane to the practice of law.");

and the initiatives represent a de minimis use of resources.[130]

    2.     Many families served by these programs are at high risk of being involved in the legal system, including families receiving assistance through the Court Appointed Special Advocate programs, families staying at women's shelters, and families being served by agencies for children with special health needs.[131]

**I.    The Plaintiff's new criticism of the Red Mass notice fails because the notice was germane.**

    1.     One of the LSBA's Twitter messages advises attorneys of the Red Mass, an event open to all legal professionals that was organized by the Saint Thomas More Catholic Lawyers Association.[132]

    2.     The LSBA traditionally notifies members of the Red Mass. The date of the Red Mass is significant because, historically, the LSBA has scheduled its annual Memorial Exercises on the same day as the Red Mass.[133] The Memorial Exercises take place at the Louisiana Supreme Court and honor deceased members of the Bench and Bar.[134]

---

Pipes at 135:13-16 (confirming that the Code of Professionalism has also been adopted by the U.S. District Court for the Eastern District of Louisiana).

[130] Pipes 117:7-12; 118:3-8; Exh. 45, Summary Exhibit (social media and email); *see also* Larsen at 183:15-24 (Secret Santa is a joint project with the Louisiana Bar Foundation.); Exh. 26, Sample Bar Brief, at 2 (The Louisiana Bar Foundation is part of the civil legal aid network.).

[131] Larsen at 184:2-9; Exh. 68, Sample Secret Santa Website Notice; *see also* Boudreaux at 88:10-15 (conceding that he is not "aware of any instance where the Bar has turned down one charitable project for one amplification in favor of Halloween costumes").

[132] Pipes at 118:13-25; Kutcher at 162:17-24 (confirming that the LSBA does not sponsor the Red Mass but simply provides information relative to where and when it will be held); Exh. 48, Louisiana Supreme Court Red Mass 2021 Press Release.

[133] Kutcher at 163:11-25 (explaining that holding both events on the same date allows the Louisiana Supreme Court Justices to attend both events while they are in town).

[134] Pipes at 118:13-25; Kutcher at 163:11-21, 164:1-6; Exh. 48, Louisiana Supreme Court Red Mass 2021 Press Release.

3.      Attorneys can choose whether to attend the Red Mass, the Memorial Exercises, or to attend neither one.[135]

4.      Notifying members of the Red Mass represents a negligible use of resources.[136]

**J.      The Plaintiff's new criticism of the social media posts fails because the posts are germane.**

1.      The criticized social media posts are communications regarding LSBA services, optional programs, and other items of interest to attorneys, including wellness and quality of life issues (germane to promote ethical practice under Louisiana Rule of Professional Conduct 1.16) and an article about iPhone usage (germane to promote ethical practice under the Louisiana Code of Professionalism's decree on technology, as well as Louisiana Rules of Professional Conduct 1.1 (competence) and 1.6 (confidentiality)). Each of these activities is germane to improving the quality of legal services and regulating the practice of law.

2.      Wellness and quality of life issues are a key component of attorney competence and professionalism.[137] Messages related to wellness and quality of life enhance engagement with the LSBA's social media platform and, in doing so, raise awareness of services, programs, and events. Many of the LSBA's Twitter messages are intended to promote the LSBA's "Wellness

---

[135] Kutcher at 164:1-6.

[136] Kutcher at 162:17-24.

[137] *See* Pipes at 102:21-103:3; *id.* at 106:21-107:3 ("[W]e live in a high stress world. There are more suicides among lawyers than there are in the general public. There's more alcoholism. There is more mental breakdowns. I think the stress of what we do and a workout helps relieve that. I think we all know people that we wish they would have taken care of themselves better and us trying to encourage lawyers to do that, I think it's an obligation of the profession."); Louisiana Rules of Professional Conduct, Rule 1.16 ("[A] lawyer shall not represent a client . . . if . . . the lawyer's physical or mental condition materially impairs the lawyer's ability to represent the client"); Rule 1.1; Louisiana District Court Rules, Rule 6.2(k) ("Attorneys . . . should abide by the Louisiana Code of Professionalism"); Boudreaux at 89:9-17 (conceding that physical and mental health are addressed in the Rules of Professional Conduct).

Wednesday" programming, which encourages attorney's to remain mindful of wellness issues and offers periodic optional CLEs directed to attorney wellness issues.[138]

3.      The LSBA uses social media to promote technological competency in the practice of law. One of the LSBA's Twitter messages links to an article about the iPhone "notes" function, including how such notes can be secured with a password or categorized by "tag."[139]

4.      Twitter messages directed to an attorney audience enhance engagement with the LSBA's social media presence at negligible expense, similar to offering coffee or donuts to increase engagement and participation with in-person programming.[140]

**K.   The Plaintiff's claims fail to meet *Lathrop*'s "major activity" requirement.**

1.      *Lathrop v. Donohue*, 367 U.S. 820, 839, 843 (1961), holds that a mandatory bar is constitutional even if it engages in some non-germane activity, provided that such activity is not a "major activity" of the bar. *See id.* at 839 ("[I]t seems plain that legislative activity is not the major activity of the State Bar. The activities without apparent political coloration are many.").[141]

2.      *McDonald* confirmed that *Lathrop*'s "major activity" test remains precedential. *McDonald*, 4 F.4th at 244 (describing *Lathrop* as holding that "compelling the plaintiff to pay dues to such a bar association did not violate the freedom of association" when the bar's legislative "activity was 'not the major activity of the State Bar'" and such activity "was limited to bills pertinent to the legal profession for which there was 'substantial unanimity'") (citations

---

[138] Pipes at 116:3-25; Ponder at 140:19-22; Exh. 49, Wellness Wednesday Documents.

[139] Pipes at 121:19-122:6; *see also* Louisiana Code of Professionalism ("I will use technology, including social media, responsibly."); Louisiana Rules of Professional Conduct, Rule 1.1 (competence), Rule 1.6 (confidentiality).

[140] Ponder at 139:21-140:4.

[141] While this description of the bar comes from *Lathrop*'s plurality opinion, a majority of the justices upheld the constitutionality of the bar. *Lathrop*, 367 U.S. at 848.

omitted); *see also Boudreaux v. La. State Bar Ass'n*, 3 F.4th 748, 754 (5th Cir. 2021) ("The plurality [in *Lathrop*] either presumed that the bar's legislative activity in the case furthered a legitimate interest or concluded that the legislative activity did not alter the First Amendment analysis because it was not the bar's 'major activity.'").

3.      Similarly, the Tenth Circuit has concluded that there must be some assessment of the relative amount of allegedly non-germane activity at issue: "A potential open issue is to what degree, in quantity, substance, or prominence, a bar association must engage in non-germane activities in order to support a freedom-of-association claim based on compelled bar membership." *Schell*, 11 F.4th at 1195 n.11 (citing *Lathrop v. Donohue*, 367 U.S. 820, 839, 843 (1961)); *see also Gruber v. Or. State Bar*, No. 3:18-CV-1591-JR, 2022 WL 1538645, at \*5 (D. Or. May 16, 2022) ("The Supreme Court in *Lathrop* accepted that 'some' degree of nongermane activity did not run afoul of the First Amendment's associational rights.").

4.      The obsolete legislative activity was de minimis.

   a.   Plaintiff has been a member of the LSBA for over twenty-five years, yet he has only identified a few now-obsolete legislative policies and positions that he contends (without any support) were non-germane.[142]

   b.   The LSBA took 492 legislative positions between 2007 and 2020—the date range implicated by the Complaint (Doc. 1) and Motion for Preliminary Injunction (Doc. 48). Plaintiff has identified very few of them as allegedly non-germane.[143]

---

[142] Boudreaux at 76:10-19; Complaint (Doc. 1), ¶¶ 40-46; Motion for Preliminary Injunction (Doc. 48) at 4-6.

[143] Boudreaux at 30:7-22; Exh. 44, Summary Exhibit (legislative positions); Complaint (Doc. 1), ¶¶ 40-46; Motion for Preliminary Injunction (Doc. 48) at 4-6.

    c.   The LSBA no longer employs a lobbyist. Thus, lobbying now constitutes 0% of LSBA's draft 2022-2023 budget,[144] and monitoring for germane legislation, which is not lobbying, constitutes a minimal amount of the budget.[145]

5.    The criticized social media posts are a minuscule proportion of the LSBA's activities.

    a.   The LSBA, LSBA President, and LSBA Young Lawyers Division published over a thousand tweets between January 1, 2020 and February 23, 2022, yet Plaintiff has identified only 18 tweets as potentially non-germane.[146]

    b.   LSBA also routinely publishes on Facebook and Instagram, yet Plaintiff has not challenged any of this social media activity.[147]

6.    Thus, the criticized activity does not impinge on the right of association because such activity is not a "major activity" of the LSBA.[148] Further, any isolated or temporally stale instance of allegedly non-germane speech is a far cry from the ongoing conduct required to show

---

[144] Kutcher at 165:24-166:2 ("We have no money for lobbying.").

[145] Larsen at 189:17-190:3; Exh. 73, May 2022 Financial Disclosure. Plaintiff has conceded that "the LSBA has followed the directives of Section[] 6 of Rule 18 for the 2022 legislative session" "in regards to taking statutory positions on bills," Boudreaux at 83:6-10, and that the LSBA is "not going to be engaged in lobbying of taking the same positions that they have taken in the past" and "understand[s] that [the LSBA] eliminated [its] lobbying committee." Boudreaux at 70:3-11.

[146] Ponder at 142:14-20; Reply re Motion for Preliminary Injunction (Doc. 70); Exh. 45, Summary Exhibit (social media and email).

[147] Ponder at 137:17-24.

[148] *See* Boudreaux at 25:23-26:11 (acknowledging that the de minimis amount ("tiny sum") of a potential refund for the criticized activity is commensurate with the extent of the alleged constitutional violation).

that prospective relief is warranted—particularly given the mootness issues set forth above.

**L.   In the alternative, the LSBA's *Hudson* safeguards are sufficient to remedy any alleged First Amendment violation.**

1.   The LSBA's notices of legislative activity are sufficient to remedy any alleged First Amendment violations.[149]

2.   The LSBA satisfies its constitutional obligations under *McDonald* to enable objecting members to recover the *pro rata* portion of dues spent toward any allegedly non-germane activity through its objection procedures, which "include an adequate explanation of the basis for the fee, a reasonably prompt opportunity to challenge the amount of the fee before an impartial decisionmaker, and an escrow for the amounts reasonably in dispute while such challenges are pending." *McDonald*, 4 F.4th at 253 (quoting *Chi. Tchrs. Union v. Hudson*, 475 U.S. 292, 310 (1986)).

3.   The LSBA's *Hudson* procedures are significantly more robust than the procedures considered and found lacking in *McDonald*.[150] For example, unlike the Texas Bar procedures considered in *McDonald,* the LSBA's procedures have been routinely used successfully by objecting members.[151] And, unlike the objection procedure considered in *McDonald*, the LSBA offers an arbitration procedure that ensures that "the matters at issue are constitutionally

---

[149]*See, e.g.*, Kutcher at 164:7-13 (During Mr. Kutcher's tenure at the Bar, he was never "aware of any complaint that we ever received talking about a lack of communication as to what the Bar Association was doing"); Larsen at 175:3-6 (Ms. Larsen is unaware of any complaints that a member of the Bar was unable to find information as to its legislative positions.); *see also supra* note 80.

[150] *McDonald*, 4 F.4th at 240-41, 252-54.

[151] *Compare* Larsen at 174:20-175:2; 186:16-23; *and* Exh. 61, 2020 Objection Refund Charts; *with McDonald*, 4 F.4th at 240-41 ("Nevertheless, the Bar has record of only one member—who is not among the plaintiffs and who lodged the objection after the plaintiffs filed this lawsuit—using the procedure since its adoption in 2005.").

appropriate for funding from the membership dues and, if not, whether the pro rata refund was correctly computed."[152]

4.    The Plaintiff has no credible challenge to the adequacy of these procedures. He has demonstrated his ability to recognize and use these procedures and has conceded that LSBA's *Hudson* procedures are not confusing and that he would know how to learn more information on any legislative position if he wished.[153]

5.    The speech to which the Plaintiff objects (legislative activity, tweets, emails regarding Secret Santa) was all publicly available and the subject of LSBA notice.

    a.    The Plaintiff received notice of each of the items of legislative activity to which he objects.[154]

    b.    The Secret Santa project is expressly identified on the LSBA's list of programs on its website.[155] The LSBA has been providing the Secret Santa service for years,[156] and the LSBA sent an email to all members notifying them of the Secret Santa project.

    c.    The Red Mass is a recurring annual event of which the LSBA has provided

---

[152] *Compare* Exh. 60, LSBA By-Laws, Art. XII, § 1; *and* Larsen at 173:22-174:19; *with* the far-more-limited refund process described in *McDonald*, 4 F.4th at 254 ("Though attorneys may register their complaints with committees and sections or lodge an objection at the Bar's annual hearing on its proposed budget, those processes give cold comfort: Any objector's opposition can be summarily overruled, leaving that lawyer on the hook to fund ideological activities that he or she does not support. . . . Moreover, whether a refund is available is left to the sole discretion of the Bar's Executive Director, and refunds are issued only 'for the convenience of the Bar.' In the event a refund is denied, the objecting attorney is out of luck.").

[153] Boudreaux at 91:7-92:2.

[154] Exh. 44, Summary Exhibit (legislative).

[155] Exh. 68, Sample Secret Santa Website Notice.

[156] Ponder at 144:13-17; Exh. 47, Secret Santa Project, *Louisiana Bar Journal* Articles.

past notice. The Red Mass was noted via an LSBA email before it occurred.[157] Members could have objected to the LSBA's publication of a notice of the Red Mass (although none did) upon receiving the email.[158]

    d.   The "Wellness Wednesday" Twitter messages are also recurrent and refer to an ongoing wellness initiative publicized on the LSBA website. LSBA members can object to any of LSBA's initiatives, including its wellness efforts.

6.    Much of the speech criticized by the Plaintiff was itself a form of notice. For example, "Wellness Wednesday" Twitter messages publicize the LSBA's wellness programming. And the now-obsolete HOD Policies put members on notice of the criteria the LSBA may use to evaluate whether or not to take a position on proposed legislation.

7.    Despite being afforded an opportunity for extensive discovery, the Plaintiff cannot identify any LSBA speech for which notice was deficient such that the Plaintiff was deprived of an opportunity to object.

8.    The LSBA's *Hudson* procedures are more robust than ever.

9.    Although the LSBA has always endeavored to engage only in germane activity, it has carefully reviewed its budget for conduct that may be subject to criticism post-*McDonald*.[159]

10.    After *McDonald*—and to avoid criticism and promote transparency—the LSBA is publishing its draft budget expenditures further in advance and providing members with a more

---

[157] Exh. 71, Sample Email, referencing Red Mass.

[158] *Id.*

[159] Larsen at 187:21-191:8; Kutcher at 151:19-152:5; Exh. 59, 2022 *Hudson* Notice; Exh. 73, May 2022 Financial Disclosure.

detailed breakdown of how their bar dues are used.[160] While the more detailed breakdown is simply a matter of arithmetic, publishing it in this format helps facilitate member review.[161]

11.    After *McDonald*, the LSBA has increased the visibility and frequency of its disclaimers.[162]

12.    After *McDonald*, the Texas Bar revised its procedures to comply with the Fifth Circuit's ruling and avoid further litigation. The LSBA voluntarily has revised its own budget notice to ensure compliance with *McDonald*.[163]

13.    Though the LSBA maintains that all its conduct is germane to regulating the legal profession or improving the quality of legal services, the LSBA's *Hudson* procedures serve as a fallback to allow a member to avoid subsidizing any potentially non-germane speech to which he or she objects in satisfaction of *McDonald*.

## III.   CONCLUSION

The Defendants respectfully submit that the Court should enter judgment in the Defendants' favor on the Plaintiff's primary claim that, even if the LSBA engages only in nongermane speech, he cannot be compelled to be a member of and pay dues to the LSBA. The alternative claim (that the Plaintiff cannot be compelled to be a member of and pay dues to the LSBA because the LSBA engages in nongermane conduct) is not justiciable. Accordingly, the Defendants respectfully suggest that the Court enter judgment dismissing without prejudice that

---

[160] *See also* Kutcher at 165:16-15 ("[W]e're full disclosure and full transparency . . . . [W]e've always provided the audited budget, there's no question about that. But, in addition to that, post-*McDonald*, post-rule amendment, we also now provide a preliminary [budget], for lack of a better term.").

[161] Larsen at 187:21-191:8; Exh. 73, May 2022 Financial Disclosure.

[162] Larsen at 175:7-20; Ponder at 145:11-16.

[163] Larsen at 187:21-191:8.

claim. If the Court determines that the alternative claim is justiciable, however, the Defendants respectfully request that the Court simply enter judgment in their favor on the entirety of this lawsuit, without distinguishing between the Plaintiff's primary and alternative claims.

Respectfully Submitted,

/s/ *Eva J. Dossier*
Richard C. Stanley, 8487
Eva J. Dossier, 35753
Kathryn W. Munson, 35933
**STANLEY, REUTER, ROSS,**
 **THORNTON & ALFORD, L.L.C.**
909 Poydras Street, Suite 2500
New Orleans, Louisiana 70112
Telephone:     (504) 523-1580
rcs@stanleyreuter.com
ejd@stanleyreuter.com
kwm@stanleyreuter.com

*Counsel for Defendants*