## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**RANDY J. BOUDREAUX**                               CIVIL ACTION

**VERSUS**                                                        No. 19-11962

**LOUISIANA STATE BAR**                              SECTION I
**ASSOCIATION, ET AL.**

### FINDINGS OF FACT & CONCLUSIONS OF LAW

Following a bench trial in the above-captioned matter held on June 21, 2022, the Court makes the following findings of fact and conclusions of law. For the reasons stated herein, the Court will grant judgment in favor of defendants, the Louisiana State Bar Association ("LSBA" or "the Bar") and the Justices of the Louisiana Supreme Court in their official capacities (collectively, "defendants"), and against plaintiff, Randy Boudreaux ("Boudreaux") as to all claims.

### I.  FACTS

**A.  Plaintiff**

Boudreaux has been licensed to practice law in Louisiana since 1996, and he has been a member in good standing of the LSBA throughout this period.[1] Boudreaux has paid his dues to the LSBA each year from 1996 to the present.[2] Boudreaux maintains an active legal practice in Louisiana.[3]

---

[1] Testimony of Randy Boudreaux ("Boudreaux") at 8:20-9:6, 10:8-11. All citations to the trial transcript herein refer to R. Doc. No. 97.

[2] Plaintiff's Exhibits ("Pl. Exh.") 1, 2, 3, 22, 23.

[3] Boudreaux at 10:2-7.

**B. The LSBA**

### 1. Membership, Governing Structure, and Functions

The LSBA is an "integrated" or "mandatory" bar association, meaning that Louisiana attorneys are required to be members of the LSBA and to pay LSBA annual dues in order to maintain eligibility to practice law.[4] The LSBA does not require its members to participate in any of its activities.[5]

The LSBA has five officers: President, President-Elect, Secretary, Treasurer, and Immediate Past President.[6] Certain LSBA affairs are administered by the Board of Governors (the "Board"), the composition of which includes representatives from different geographic districts. The House of Delegates ("HOD") is the LSBA's policy making body, and it includes 225 delegates, with representatives from each judicial district.[7] Previously, the HOD made legislative policies. Now, however, all HOD legislative policies in place prior to the filing of this action have been rescinded, as set forth in greater detail below.

The purpose of the LSBA, as stated in Louisiana Supreme Court Rule XVIII, Section 6, "is to promote and assist the regulation of the practice of law, improve the quality of legal services, advance the science of jurisprudence, promote the

---

[4] Defendants' Exhibit ("Defs. Exh.") 2; Defs. Exh. 7, By-Laws, art. I, §§ 3-4, Delinquent Dues. Annual dues are $80-200, depending on how long a member has been admitted to practice law. Members admitted for 50 years or more and inactive members need not pay dues. The Board of Governors has authority to waive dues for members experiencing dire circumstances such as illness or financial hardship. *Id.*

[5] Boudreaux at 92:16-93:2.

[6] Testimony of Robert Kutcher ("Kutcher") at 155:18-24; Defs. Exh. 4.

[7] Kutcher at 153:21-25.

administration of justice, uphold the honor of the Courts and of the profession of law including Louisiana's civil law system, and, generally, to promote the welfare of the profession in the State."[8]

The LSBA performs many functions, which the Court will not exhaustively catalog. Among other things, the LSBA administers continuing legal education ("CLE") programming,[9] assists in the administration of the Supreme Court's rules for lawyer advertising,[10] regulates all matters pertaining to certified areas of specialization within the practice of law,[11] maintains a standing committee on the Rules of Professional Conduct,[12] administers the Transition into Practice Program,[13] publishes the *Louisiana Bar Journal*,[14] funds and appoints the leadership of the Judges and Lawyers Assistance Program ("JLAP"),[15] administers the Lawyer

---

[8] Defs. Exh. 3.

[9] Testimony of Sandra Vujnovich ("Vujnovich") at 195:11-196:24; Defs. Exh. 11.

[10] Testimony of Loretta Larsen ("Larsen") at 176:3-11; Vujnovich at 194:22-195:5; Defs. Exh. 10.

[11] Vujnovich at 196:25-198:2; Defs. Exh. 12; Defs. Exh. 13.

[12] Vujnovich at 198:3-23; Defs. Exh. 14; Defs. Exh. 15.

[13] Larsen at 181:4-182:3; Defs. Exh. 21. This program matches experienced attorneys with attorneys for mentorship and related programming.

[14] Larsen at 184:18-20; Testimony of Kelly Ponder ("Ponder") at 141:8-11; Defs. Exh. 9.

[15] This program provides direct and confidential assistance to law students, lawyers, and judges with a variety of issues including substance abuse, aging, and mental health issues. *See* Larsen at 180:22-181:3; Pipes at 112:11-115:8; *id.* at 113:11-21 ("[A] huge percentage of the lawyers that go into the disciplinary system" have mental health or substance abuse issues, and JLAP is intended to keep people out of the disciplinary system.); Defs. Exh. 28.

Dispute Resolution Program,[16] and participates in the Access to Justice Commission.[17]

The LSBA does not oversee the admission or licensing of new attorneys.[18] The LSBA also does not oversee attorney disciplinary matters.[19] The Louisiana Disciplinary Board administers Louisiana's attorney discipline and disability system, pursuant to Louisiana Supreme Court Rule XIX.[20] All attorneys licensed in Louisiana must pay an annual "assessment" to the Louisiana Disciplinary Board.[21]

## 2. Notice and Objection Procedures

The LSBA publishes audited annual reports each year providing information on its use of mandatory dues and other revenue.[22] The LSBA also published its draft budget expenditures for 2022–23.[23] Bar activities are published to members through multiple sources, including the LSBA website, emails to LSBA members, the

---

[16] Larsen at 176:15-177:12; Defs. Exh. 25; Defs. Exh. 31. This program was created to provide quick, low cost, and confidential solutions to fee disputes between clients and attorneys and fee disputes solely between attorneys. *Id.*

[17] Vujnovich at 199:21-200:10; 200:23-201:12; Defs. Exh. 17; Defs. Exh. 18. The Commission was created to increase low and moderate income Louisianian's access to civil legal services. *Id.*

[18] Boudreaux at 13:9-16; R. Doc. No. 60, at ¶¶ 28, 34. Louisiana Supreme Court Rule XVII governs admission to the bar in Louisiana. *Id.*

[19] R. Doc. No. 60, at ¶ 32; Boudreaux at 11:25-12:4; 12:11-19; 13:5-8.

[20] R. Doc. No. 60, at ¶ 32; Boudreaux at 11:25-12:4.

[21] R. Doc. No. 60, at ¶ 33; Boudreaux at 12:5-10.

[22] Larsen at 184:16-20; Defs. Exh. 58.

[23] Larsen at 187:18-188:2; Defs. Exh. 73.

*Louisiana Bar Journal*, Bar Briefs, Facebook, Twitter, and Instagram.[24] The LSBA also routinely publishes and promotes non-legislative activity, such as CLEs.[25]

The LSBA's By-Laws require that the adoption of legislative positions be timely published in a regular communications vehicle with electronic notice to members.[26] The notice of adoption of legislative positions is sent to members via emailed "Bar Briefs."[27] The Bar Briefs contain a prominent notice of the adoption of positions on bills.[28]

Any member who objects to the use of any portion of the member's bar dues for a cause that he or she believes to be non-germane may file an objection.[29] Members have 45 days after notice of an activity is published to submit a written objection.[30] Historically, all timely objections have resulted in refunds.[31] If a member objects to legislative activity, his or her refund amount is calculated *pro rata* based on all of the LSBA's legislative activity.[32] In other words, the potential refund amount is not limited to only the bill or bills to which the member specifically objects.

Once an objection is filed, the *pro rata* amount of the objecting member's dues devoted to the challenged activity is promptly placed in escrow pending the outcome

---

[24] Ponder at 141:8-14; Defs. Exh. 64; Defs. Exh. 26; Defs. Exh. 65; Defs. Exh. 66; Defs. Exh. 67; *see also* Ponder at 145:20-146:2.

[25] Larsen at 177:15-17; Defs. Exh. 69.

[26] Defs. Exh. 5.

[27] Ponder at 146:6-9; Defs. Exh. 26.

[28] Defs. Exh. 26.

[29] Larsen at 174:3-4; Defs. Exh. 59; Defs. Exh. 60, LSBA By-Laws, Art. XII, § 1.

[30] Larsen at 174:9-12; Defs. Exh. 60, LSBA By-Laws, Art. XII, § 1.

[31] Larsen at 174:23-175:2.

[32] Larsen at 174:13-15; Defs. Exh. 61.

of the objection.[33] Within 60 days, the Board either provides a *pro rata* refund or refers the matter to arbitration.[34] If an objection is to be arbitrated, a panel of three arbitrators is constituted as soon as is practicable, with the objecting member selecting the first arbitrator, the LSBA selecting the second, and the third arbitrator selected by agreement of the first two arbitrators.[35]

### 3. The LSBA's Post-*McDonald* Changes

On July 8, 2021,[36] in the wake of the Fifth Circuit's decision in *McDonald v. Longley*, 4 F.4th 229 (5th Cir. 2021), the LSBA Board of Governors voted to suspend the then-existing Legislation Committee of the LSBA and all legislative activities until the House of Delegates convened for its January 2022 meeting.[37]

The Louisiana Supreme Court also adopted Rule XVIII, § 6, which codifies the constitutional germaneness standard and shifts responsibility for legislative policy and positions from the Legislation Committee and House of Delegates respectively to the Board of Governors.[38] Accordingly, the House of Delegates (and the Legislation Committee) are no longer responsible for the LSBA's legislative policy positions and advocacy, if any. Instead, the Board of Governors is the sole LSBA entity that can

---

[33] Defs. Exh. 60, LSBA By-Laws, Art. XII, § 1.

[34] *Id.*

[35] *Id.*

[36] *See* Kutcher at 150:17 (The LSBA "acted very quickly. I mean, understand this opinion came out on a Friday afternoon, July 4th weekend, and [by] July 8th, the Legislation Committee was suspended."); *id.* at 151:14-18 (The LSBA took immediate action after *McDonald* without waiting to see whether the Texas Bar would seek en banc or Supreme Court review.).

[37] Testimony of H. Minor Pipes, III ("Pipes") at 123:9-17; Kutcher at 150:13-21; 153:7-10; Defs. Exh. 51; Defs. Exh. 52.

[38] *See* R. Doc. 64 (Notice of Louisiana Supreme Court Rule Change).

perform such functions, and its activities are limited to constitutionally germane topics such as those identified as appropriate in *McDonald*.[39]

At the January 2022 meeting, the House of Delegates approved resolutions to (1) rescind all existing legislative policy positions; (2) revise the LSBA's by-laws "to more accurately reflect current operating practices and remove outdated and obsolete provisions that are no longer effective"; and (3) recognize that the LSBA is bound by Rule XVIII, § 6 and suspend "any [LSBA] activity not within [the Rule's] scope, including but not limited to any action with respect to legislative policy provisions previously adopted by the House of Delegates (which provisions are now obsolete and no longer effective under the text of the Rule)."[40] The LSBA has not engaged in any legislative advocacy since *McDonald*.[41] Additionally, the LSBA no longer pays for a lobbyist.[42]

---

[39] Kutcher at 153:7-10; Defs. Exh. 3; *see also* Kutcher at 150:4-17 (explaining why the shift in responsibility will make a difference in legislative activity and confirming that the Board of Governors passed the post-*McDonald* resolutions unanimously).

[40] Kutcher at 125:12-126:25; Defs. Exh. 53; Defs. Exh. 54; Defs. Exh. 55. Although the House of Delegates no longer maintains legislative policy provisions, it concurrently passed several general (i.e., non-legislative) policy provisions. *See* Kutcher 158:19-21. The policy provisions relate to attorney-client privilege and work product, the taxation of legal services, access to justice through pro bono services, compensation for members of the state judiciary, the unauthorized practice of law, and diversity within the legal profession. *See* R. Doc. 71-3 (new general policy positions). The Plaintiff concedes that the principles underpinning these positions are germane. *See* Boudreaux at 77:5-79:5.

[41] Pipes at 129:23-130:1; Kutcher at 167:7-15.

[42] Larsen at 189:17-190:1; Kutcher at 165:16-166:6; Defs. Exh. 73. The draft budget reflects that the LSBA anticipates spending approximately $10,000 to monitor potential legislation that would be germane under *McDonald* and within the scope of the standards set by Rule XVIII, § 6.

### 4. Alleged Non-Germane Activities

Prior to trial, the parties stipulated that the only activities criticized by the plaintiff for purposes of this case are the ones identified in the plaintiff's complaint, discovery responses, and motion for preliminary injunction.[43] The Court will enforce the stipulation and will not consider evidence pertaining to activities that occurred outside the scope of the parties' stipulation. As stipulated by the parties, plaintiff criticizes[44] the following tweets and emails issued by the LSBA:

1. "touting the purported benefits of broccoli" (July 7, 2021)

2. "touting the purported benefits of walnuts" (July 28, 2021)

3. "urging readers to set fitness goals and work out at least three times per week" (August 4, 2021)

4. "touting the benefits of sunlight" (August 11, 2021)

5. "advising readers on which snacks to eat before bedtime" (August 18, 2021)

6. "promoting an article in a non-legal publication regarding 'habits of especially happy people'" (August 25, 2021)

7. "touting the purported benefits of drinking juice, especially tart cherry or beet juice, after exercise" (August 25, 2021)

8. "promoting an article in a non-legal publication regarding public policies addressing student debt" (August 25, 2021)

---

[43] *See* R. Doc. No. 83, ¶ 7.dd (Pretrial Order) ("The only activities of the LSBA Mr. Boudreaux criticizes are the ones of which he has become aware that are identified in the Complaint, Motion for Preliminary Injunction, Mr. Boudreaux's discovery responses, and in his deposition testimony.").

[44] R. Doc. No. 87-1, at 4–5. Although, as stated above, defendants stipulated that the only activities criticized by the plaintiff for purposes of this case are the ones identified in the plaintiff's complaint, discovery responses, and motion for preliminary injunction, defendants also reserved the right to object if plaintiff introduced evidence of activities that were referenced in discovery responses or the motion for preliminary injunction, but not in the complaint (as is the case for all of the tweets and emails enumerated, *infra*, in this section). R. Doc. No. 87-1, at 2 n.1. Defendants did not ultimately raise such an objection at trial.

9. "touting the benefits of '[v]isualiz[ing] your calm'" (September 15, 2021)

10. "promoting an article on a non-legal website regarding a purported 'outstanding upgrade' in Apple iOS 15" (September 21, 2021)

11. "urging readers to test and change batteries in their smoke and carbon monoxide detectors" (September 22, 2021)

12. "urging readers to try fresh fall foods from their local farmers' market" (September 29, 2021)

13. "advising readers to take naps of '30 minutes max'" (October 27, 2021)

14. "advising readers to avoid eating meals before bedtime" (October 27, 2021)

15. "promoting an article in a non-legal publication about the habits of happy people" (September 13, 2021)

Additionally, plaintiff criticizes two of the LSBA's tweets providing notice of the "69th Annual Red Mass" hosted by the St. Thomas More Catholic Lawyers Association.[45] The Red Mass at issue was hosted by the St. Thomas More Catholic Lawyers Society without LSBA funding.[46]

Finally, plaintiff criticizes the LSBA's use of a tweet and email to notify members about the opportunity to participate in two holiday charity drives.[47] The Secret Santa Program is designed as a charity to provide anonymous holiday gifts to needy children. The "Ween Dream" Program is designed as a charity to provide anonymous gifts of Halloween costumes to needy children. The LSBA does not contribute gifts or costumes towards either of these drives.[48]

---

[45] Boudreaux at 68:12-19; Defs. Exh. 45.

[46] Pipes at 118:13-25; Kutcher at 164:1-4; Defs. Exh. 48.

[47] Larsen at 183:11-184:9; Defs. Exh. 45.

[48] Pipes at 117:11-14; Larsen at 191:4-8 (acknowledging that the LSBA expends "a very minor amount" of money on the committees that organize the charitable drives, but expends no funds on the gifts or costumes themselves).

## II.  PROCEDURAL HISTORY

On January 13, 2020, the Court granted defendants' motion to dismiss. Specifically, the Court dismissed plaintiff's challenge to mandatory LSBA membership, deeming it foreclosed by the United States Supreme Court's decisions in *Lathrop v. Donohue*, 367 U.S. 820 (1961), and *Keller v. State Bar of California*, 496 U.S. 1 (1990).[49] The Court also dismissed plaintiff's challenge to mandatory LSBA dues, concluding that it was barred by the Tax Injunction Act.[50] Finally, the Court dismissed plaintiff's claim challenging the LSBA's lack of procedural safeguards, concluding that plaintiff lacked standing to raise the claim.[51]

On appeal, the United States Court of Appeals for the Fifth Circuit reversed the dismissal of plaintiff's challenge to mandatory membership, concluding that it is not foreclosed by *Lathrop* and *Keller. Boudreaux v. La. State Bar Ass'n*, 3 F.4th 748, 755 (5th Cir. 2021). The Fifth Circuit also reversed dismissal of plaintiff's challenge to mandatory dues, concluding that the Tax Injunction Act does not apply, *id.* 756–58, and it reversed dismissal of his claim that the LSBA's procedural safeguard are insufficient, concluding that plaintiff has standing to raise the claim, *id.* at 760.

After the Fifth Circuit remanded the action, plaintiff filed a motion[52] for preliminary injunction. The Court scheduled trial for June 21, 2022, consolidating the hearing on the motion for preliminary injunction with the trial on the merits.[53]

---

[49] R. Doc. No. 35, at 53–56.

[50] *Id.* at 11–19.

[51] *Id.* at 30–35.

[52] R. Doc. No. 48.

[53] R. Doc. No. 72.

### III. STANDARD OF LAW

To obtain a permanent injunction, "a plaintiff must demonstrate: (1) that [he] has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Merritt Hawkins & Associates, L.L.C. v. Gresham*, 861 F.3d 143, 157–58 (5th Cir. 2017) (citations and quotations omitted) (quoting *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)). "Injunctive relief is an extraordinary and drastic remedy, not to be granted routinely, but only when the movant, by a clear showing, carries the burden of persuasion." *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985).

Pursuant to the Declaratory Judgment Act,

> In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

28 U.S.C. § 2201(a). "When considering a declaratory judgment action, a district court must engage in a three-step inquiry." *Orix v. Credit Alliance, Inc. v. Wolfe*, 212 F.3d 891, 895 (5th Cir. 2000). "A federal district court must determine (1) whether the declaratory action is justiciable; (2) whether the court has the authority to grant declaratory relief; and (3) whether to exercise its discretion to decide or dismiss the action." *Sherwin-Williams Co. v. Holmes Cnty.*, 343 F.3d 383, 387 (5th Cir. 2003).

## IV.  LAW AND ANALYSIS

Plaintiff's primary claim is that compelled membership in the LSBA violates his First and Fourteenth Amendment rights, even if the LSBA engages only in germane activities ("first claim").[54] In the alternative, plaintiff claims that compelled membership in the LSBA violates his First and Fourteenth Amendment rights because the LSBA engages in non-germane activities ("second claim").[55] Finally, plaintiff claims that the LSBA's objection procedures fail to ensure that his mandatory dues are used only for germane activities, in violation of the First and Fourteenth Amendments ("third claim").[56] The Court will consider the justiciability of plaintiff's claims before proceeding to the merits.

### A.  Standing, Mootness, and Ripeness

Article III of the U.S. Constitution limits federal jurisdiction to justiciable "Cases" and "Controversies." A plaintiff must have standing to meet the "case-or-controversy" requirement. *McCardell v. U.S. Dept. of Housing*, 794 F.3d 510, 516–17 (5th Cir. 2015). The party invoking federal jurisdiction bears the burden of establishing standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). "Most standing cases consider whether a plaintiff has satisfied the requirement when filing suit, but Article III demands that an 'actual controversy' persist throughout all stages of litigation." *Hollingsworth v. Perry*, 570 U.S. 693, 705 (2013). Additionally, "a plaintiff must demonstrate standing separately for each form of relief

---

[54] R. Doc. No. 1, at 13 (First Claim for Relief); R. Doc. No. 92, at 8.

[55] R. Doc. No. 1, at 15 (Second Claim for Relief); R. Doc. No. 92, at 8.

[56] R. Doc. No. 1, at 17.

sought." *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 185 (2000).

Article III standing is established when a plaintiff has an injury that is: "(1) concrete, particularized, and actual or imminent ([a] so-called injury 'in fact'); (2) fairly traceable to the challenged action; and (3) redressable by a favorable ruling." *McCardell*, 794 F.3d at 517 (citing *Monsanto Co. v. Geerston Seed Farms*, 561 U.S. 139, 149 (2010)). "Article III standing requires a plaintiff seeking injunctive relief to allege 'actual or imminent' and not merely 'conjectural or hypothetical' injury." *Frame v. City of Arlington,* 657 F.3d 215, 235–36 (5th Cir. 2011) (en banc). A plaintiff seeking injunctive relief also bears the additional burden of establishing a "real or immediate threat that the plaintiff will be wronged" in the future. *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983).

"A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (some internal quotation marks omitted). Even if "the parties continue to dispute the lawfulness of the conduct that precipitated the lawsuit," the case is moot if the dispute "is no longer embedded in any actual controversy about the plaintiffs' particular legal rights." *Id.* (quotation omitted).

A defendant who voluntarily ceases allegedly unlawful conduct bears the burden of showing "that the challenged behavior cannot reasonably be expected to recur." *Id.* at 96. A plaintiff cannot avoid dismissal based on mootness, however,

merely by invoking "conjectural or hypothetical speculation" about future events. *See id.* at 97. Relatedly, the fact that a defendant engaged in allegedly unlawful conduct in the past does not show that such conduct will recur. *See id.* The Supreme Court has "never held that a plaintiff has standing to pursue" non-monetary relief "merely on the basis of being 'once bitten.' Quite the opposite." *Id.* at 98 (citing *Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983)); *Lyons*, 461 U.S. at 109 (holding there was no justiciable controversy to support a declaratory judgment where plaintiff had once been subjected to a chokehold in the past).

"Although voluntary cessation of a challenged activity does not ordinarily deprive a federal court of its power to determine its legality, courts are justified in treating a voluntary governmental cessation of potentially wrongful conduct with solicitude." *Turner v. Texas Dep't of Crim. Just.*, 836 F. App'x 227, 229 (5th Cir. 2020) (citing *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 325 (5th Cir. 2009)). "Such self-correction provides a secure foundation for a dismissal based on mootness so long as it appears genuine." *Id.* (citing *Ragsdale v. Turnock*, 841 F.2d 1358, 1365 (7th Cir. 1988)). Thus, "without evidence to the contrary, courts assume that formally announced changes to official policy are not mere litigation posturing." *Id.* at 229.

Defendants raise several justiciability arguments as to plaintiff's second claim, although they do not dispute the justiciability of plaintiff's first and third claims.[57] The Court also concludes that the first and third claims are justiciable. For the

---

[57] Defendants explicitly concede that the first claim is justiciable, R. Doc. No. 99, at 23–24, and do not contend that the third claim is nonjusticiable.

purposes of determining the justiciability of plaintiff's second claim, it is helpful to divide the allegedly non-germane activities contained therein into three categories: (1) activities that occurred prior to *McDonald*, (2) activities occurring after *McDonald*, during the course of this litigation, and (3) activities that plaintiff alleges the LSBA is likely to undertake in the future. The Court concludes that plaintiff's claim as to activities occurring after *McDonald* is justiciable. However, his claims as to past and future activities are nonjusticiable, as set forth below.

Plaintiff's claim is moot insofar as he challenges the LSBA's former legislative positions and now-rescinded policies of the House of Delegates, which occurred in the past and are not ongoing.[58] As set forth in greater detail above, in the wake of *McDonald*, the Louisiana Supreme Court expressly amended its Rule XVIII, which governs the Louisiana State Bar Association, to require that the LSBA comply with the constitutional requirements expressed in the *McDonald* decision.[59] Further, in January 2022, the House of Delegates approved resolutions to rescind all existing legislative policy positions, to recognize that the LSBA is bound by Louisiana Supreme Court Rule XVIII, § 6, and to suspend "any [LSBA] activity not within its scope, including but not limited to any action with respect to legislative policy provisions previously adopted by the House of Delegates (which provisions are now obsolete and no longer effective under the text of the Rule)."[60] Finally, more than a

---

[58] Plaintiff admits that these policies "are no longer in effect." Boudreaux at 48:13-16.
[59] Pipes at 128:1-5; Kutcher at 153:7-16; Defs. Exh. 3, La. S. Ct. Rule XVIII.
[60] Kutcher at 125:12-126:25; Defs. Exh. 53, Board of Governors Minutes and Resolution Regarding Rule XVIII, Section 6; Defs. Exh. 54, Bar Governance Committee Resolution Regarding By-Laws Revisions (Doc. 71-1); Defs. Exh. 55, Bar

year has passed since *McDonald* was decided, during which time the LSBA has not engaged in any legislative activity to which plaintiff objects.

"Although voluntary cessation of a challenged activity does not ordinarily deprive a federal court of its power to determine its legality," the Court concludes that it is appropriate to treat defendants' voluntary cessation with solicitude in this case. *Turner*, 836 F. App'x at 229. Defendants took swift and thorough corrective action in the wake of *McDonald*.[61] Additionally, the Court finds the testimony of LSBA officials to be genuine and credible with respect to the LSBA's intention to comply with *McDonald*.[62] Because defendants' "self-correction . . . appears genuine" *Turner*, 836 F. App'x at 229, this aspect of plaintiff's claim is moot.[63]

---

Governance Committee Resolution Proposing to Rescind Legislative Policy Positions (Doc. 71-2).

[61] *See, e.g.*, Kutcher at 150:17-21 ("[The LSBA] acted very quickly [after *McDonald* was decided]. I mean, understand this opinion came out on a Friday afternoon, July 4th weekend, and by what, July 8th, the Legislation Committee was suspended. I mean . . . it was an easy decision based on *McDonald*.")

[62] Plaintiff contends that defendants' conduct does not suggest that the LSBA will cease its non-germane activities, because "[d]efendants have maintained all the LSBA's activities are 'germane,' and they have not renounced that view even though the LSBA's conduct is plainly contrary to *McDonald*." R. Doc. No. 92, at 14 (citing R. Doc. No. 69, at 20 n.41). However, the Court understands defendants to assert that the measures that they have taken are to ensure that they do not come close to "crossing the line" between germane and non-germane activities. Kutcher at 157:10-25, 158:1-16 (explaining that taking a position on an immunities provision in a proposed bill would be "real close to [the] line" of non-germaneness and indicating that the LSBA would no longer be inclined to take a position on such matters).

[63] Insofar as plaintiff seeks declaratory relief with respect to defendants' previous conduct, this claim is also moot. *See, e.g.*, *Freedom From Religion Found. v. Abbott*, 955 F.3d 417, 425-26 (5th Cir. 2020) (citing *Green*, 474 U.S. at 68-69, for the proposition that "the Eleventh Amendment barred a claim for declaratory relief once the claim for injunctive relief was rendered moot"); *Hughes v. Johnson*, No. 15-7165, 2016 WL 6124211, at *4 (E.D. La. Oct. 20, 2016) (Vance, J.) ("In other words, plaintiffs seek declarations that Defendant Justices' *past* conduct violated federal law. These

Relatedly, insofar as plaintiff asserts that defendants are likely to engage in non-germane activities in the future, such claims are too speculative and remote to support standing. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 409 (2013) ("[T]hreatened injury must be *certainly impending* to constitute injury in fact, and . . . allegations of *possible* future injury are not sufficient[.]" (emphasis in original) (quotation omitted)). Additionally, the hypothetical nature of plaintiff's concerns renders the claim unripe. *See, e.g.*, *Orix Credit All., Inc. v. Wolfe*, 212 F.3d 891, 895 (5th Cir. 2000) ("A case is generally ripe if any remaining questions are purely legal ones; conversely, a case is not ripe if further factual development is required.").

## B. First Amendment Claims

The Fifth Circuit recently elaborated on the First Amendment's applicability to mandatory bar associations in *Boudreaux* and *McDonald*. In *McDonald*, the court surveyed the two Supreme Court cases considering First Amendment challenges pertaining to mandatory bar associations—*Lathrop v. Donohue*, 367 U.S. 820 (1961), and *Keller v. State Bar of California*, 496 U.S. 1 (1990)—and noted that these cases left several substantial First Amendment issues in this context unresolved. *See id.* at 243–44.[64]

---

claims are therefore retrospective, and [*Ex Parte*] *Young* will not save them." (emphasis in original)). Additionally, because the Court concludes that plaintiff's claims are moot insofar as they pertain to previous conduct and policies that have since been ceased and repealed, respectively, the Court declines to reach defendants' argument that such claims are time-barred pursuant to the one-year statute of limitations for § 1983 claims.

[64] The court summarized *Lathrop* and *Keller* as follows: "*Lathrop* held that lawyers may constitutionally be mandated to join a bar association that solely regulates the legal profession and improves the quality of legal services. *Keller* identified

The court issued several significant holdings pertaining to these issues. First, the court held that "[c]ompelled membership in a bar association that is engaged in only germane activities survives [exacting scrutiny]." *Id.* at 246. Accordingly, plaintiff's first claim—that compelled membership in the LSBA violates his First and Fourteenth Amendment rights, even if the LSBA engages only in germane activities—is foreclosed by *McDonald*.[65]

Second, the court held that compelling individuals to join bar associations engaged in non-germane activities violates their First Amendment *freedom of association. Id. at* 252; *see also id.* at 246 ("Compelled membership in a bar association that engages in non-germane activities . . . fails exacting scrutiny."). Under this holding, such violations *cannot* be cured by the availability of sufficient notice and opt-out procedures.[66]

---

that *Lathrop* did not decide whether lawyers may be constitutionally mandated to join a bar association that engages in other, non-germane activities. Nor did *Keller* resolve that question." *McDonald*, 4 F.4th at 244.

[65] Plaintiff argues that a contrary result is warranted pursuant to the Supreme Court's recent decision in *Janus v. AFSCME*, 138 S. Ct. 2448 (2018). *See, e.g.*, R. Doc. No. 92, at 8–10. However, the Fifth Circuit has already rejected this argument. *See McDonald*, 4 F.4th at 253. It goes without saying that this Court—as a federal district court—does not possess the ability to defy Fifth Circuit precedent. *Cf. Legendre v. Huntington Ingalls Inc.*, No. 17-2162, 2017 WL 2881324, at *2 n.5 (E.D. La. July 6, 2017) (Africk, J.) (citing J.R.R. Tolkien, *The Fellowship of the Ring*, bk. 1, ch. 3 (1954)) ("Do not meddle in the affairs of Wizards, for they are subtle and quick to anger."); Alvin B. Rubin, *Views From the Lower Court,* 23 UCLA L. Rev. 448, 451 (1976) ("If only trial judges were more learned, wrote better findings of fact, gave more cogent reasons for their decisions, and studied the law more thoroughly, the appellate task would be simplified.").

[66] The Fifth Circuit concluded, in sum, that "the Bar is engaged in non-germane activities, so compelling the plaintiffs to join it violates their First Amendment rights. There are multiple other constitutional options: The Bar can cease engaging in non-germane activities; Texas can directly regulate the legal profession and create

Third, the court held, in the alternative, that compelling individuals to subsidize a bar association's non-germane activities violates their First Amendment *freedom of speech*. *Id.* at 252; *see also id.* at 252 n.39 (noting that alternative holdings are binding precedent in the Fifth Circuit). Under this holding, such violations *can* be cured by the availability of sufficient notice and opt-out procedures. *Id.* at 253–54 ("[A]ssuming that plaintiffs can be compelled to join the Bar at all, the Bar may constitutionally use some sort of opt-out procedure for giving pro-rata refunds.").

Finally, in *Boudreaux*, the court clarified that "the inability to identify non-germane expenses is itself a constitutional injury, entitling the plaintiffs to relief." *McDonald*, 4 F.4th at 253 (citing *Boudreaux*). The court further held that the procedural safeguards set forth in *Chicago Teachers Union v. Hudson*, 475 U.S. 292 (1986)—which *Keller* cited with approval but did not mandate—set "the constitutional floor" for assessing bar associations' procedures. *Boudreaux*, 3 F.4th at 758.

### 1. Whether the Bar is Engaged in Non-Germane Activities

Plaintiff's second claim is that compelled membership in the LSBA violates his First and Fourteenth Amendment rights because the LSBA engages in non-germane activities.[67]

---

a voluntary bar association, like New York's; or Texas can adopt a hybrid system, like California's. But it may not continue mandating membership in the Bar as currently structured or engaging in its current activities." *Id.* at 252.

[67] R. Doc. No. 1, at 15 (Second Claim for Relief); R. Doc. No. 92, at 8 ("Plaintiff should prevail on his challenge to Louisiana's mandatory bar membership claim because it fails the heightened scrutiny the law requires of such compelled associations, whether

"For activities to be germane, they must be 'necessarily or reasonably incurred for'" the purposes of "regulating the legal profession" or "improving the quality of legal services." *McDonald*, 4 F.4th at 247 (quoting *Keller*, 496 U.S. at 14, 13). The Fifth Circuit rejected the notion that activities of a political or ideological nature, including lobbying, are necessarily non-germane. *Id.* at 247. Thus, for instance, "legislation regarding the functioning of the state's courts or legal system writ large" and "advocating for laws governing the activities of lawyers *qua* lawyers" is germane. *Id.* at 248. "The germaneness test does not require that there be unanimity on the Bar's position on what best regulates the legal profession—that is typically for the Bar to decide." *Id.* at 249. Therefore, so long as an issue is germane, a bar association may permissibly take even a highly ideological or controversial stance on said issue. *Id.*

Finally, *Lathrop* left "[a] potential open issue [as] to what degree, in quantity, substance, or prominence, a bar association must engage in non-germane activities in order to support a freedom-of-association claim based on compelled bar membership." *Schell v. Chief Just. & Justs. of Okla. Sup. Ct.*, 11 F.4th 1178, 1195 n.11 (10th Cir. 2021).[68] *See also Gruber v. Or. State Bar*, 2022 WL 1538645, at

---

considering the LSBA's past "non-germane" conduct and likelihood to engage in future non-germane conduct[.]").

[68] As the court further explained, "[t]he *Lathrop* plurality, in concluding that compelled membership in the state bar did not 'impinge[ ] upon protected rights of association,' thought it important that 'the *bulk* of State Bar activities serve[d]' the legitimate functions of the bar association. The plurality concluded that '[g]iven the character of the integrated bar shown on th[e] record,' compelled membership was constitutionally permissible 'even though' the bar 'also engage[d] in some legislative activity.' The plurality also observed that 'legislative activity [was] not the *major activity*' of the bar." *Schell*, 11 F.4th at 1195 n.11 (quoting *Lathrop*, 367 U.S. at 843, 839) (emphasis added).

*5 (D. Or. May 16, 2022) ("The Supreme Court in *Lathrop* accepted that 'some' degree of nongermane activity did not run afoul of the First Amendment's associational rights."). It is not entirely clear that the Fifth Circuit has resolved this question. For instance, in *Boudreaux*, the court observed that the *Lathrop* plurality opinion is "unclear" insofar as it "either presumed that the bar's legislative activity in the case furthered a legitimate interest or concluded that the legislative activity did not alter the First Amendment analysis because it was not the bar's 'major activity.'" 3 F.4th at 754 (quoting *Lathrop*, 367 U.S. at 839–43).

The unequivocal nature of *McDonald*'s holding that "[c]ompelled membership in a bar association that engages in non-germane activities . . . fails exacting scrutiny," 4 F.4th at 246, could be read to indicate that even negligible instances of non-germane activity are sufficient to render a bar association permanently unconstitutional. On the other hand, the activities that the Fifth Circuit analyzed in *McDonald*—the Texas Bar's legislative program, diversity initiatives, *pro bono* programs, annual convention, CLE programs, and publication of the *Texas Bar Journal*, *id.* at 247–51—were far more substantial than the tweets, press releases, and emails criticized by plaintiff in this matter. Thus, the court was not presented with an opportunity to consider this particular question.

In light of the lack of clarity with respect to the *Lathrop*'s "major activity" component, *Boudreaux*, 3 F.4th at 754, and the fact that the Fifth Circuit was not presented with minor activities in *McDonald*, the Court declines to read these cases as dictating that the constitutional viability of a mandatory bar association can hinge

on a single non-germane tweet. After all, the implications of such a reading would be severe: even the most careful, well-intentioned bar association will occasionally engage in minor activities that may be characterized as non-germane. If a single instance of non-germane speech, no matter how negligible, gives rise to a constitutional violation—a violation which cannot be remedied by a pro rata refund of fees, pursuant to *McDonald*'s freedom of association holding—then the practical effect will be that mandatory bar associations will eventually be rendered extinct. This Court will not reach such a conclusion, absent clearer guidance from the Fifth Circuit or the Supreme Court. With these principles in mind, the Court will analyze whether the post-*McDonald* activities criticized by plaintiff are germane.

Proceeding to the specific criticized activities in this case, plaintiff first objects to multiple LSBA tweets pertaining to physical and mental health. These tweets are generally intended to promote "Wellness Wednesday" programming, which encourages attorneys to remain mindful of wellness issues and offers periodic optional CLEs directed to attorney wellness issues.[69] These activities are germane to improving the quality of legal services. Defendants offered testimony at trial regarding the increased rates of mental health issues and alcoholism in the legal profession, as compared to the general public.[70] Further, the Louisiana Rules of

---

[69] Pipes at 116:3-25; Ponder at 140:19-22; Defs. Exh. 49.

[70] *See* Pipes at 102:21-103:3; *id.* at 106:21-107:3 ("There are more suicides among lawyers than there are in the general public. There's more alcoholism. There [are] more mental breakdowns. I think the stress of what we do and a workout helps relieve that. I think we all know people that we wish they would have taken care of themselves better and us trying to encourage lawyers to do that, I think it's an obligation of the profession.").

Professional Conduct provide that "a lawyer shall not represent a client . . . if . . . the lawyer's physical or mental condition materially impairs the lawyer's ability to represent the client." Finally, the LSBA also provides funding for the Judges and Lawyers Assistance Program ("JLAP"), which provides confidential assistance to law students, lawyers, and judges with a variety of issues pertaining to substance abuse, aging, and mental health.[71]

At trial, plaintiff expressed that he disagreed with the substance of the LSBA's wellness communications.[72] However, "[t]he germaneness test does not require that there be unanimity on the Bar's position . . . that is typically for the Bar to decide." *McDonald*, 4 F.4th at 249.

Second, plaintiff criticizes the LSBA for notifying its members of the opportunity to participate in voluntary holiday charitable drives—namely, "Ween Dream" and the Secret Santa program. As noted above, the LSBA does not contribute costumes or gifts to these drives.[73] Plaintiff only criticizes the LSBA insofar as it notified members about the drives via Twitter and email. Announcements regarding the charitable drives are germane because the Code of Professionalism confirms that lawyers should "work to protect and improve the image of the legal profession in the

---

[71] *See* Larsen at 180:22-181:3; Pipes at 112:11-115:8; *id.* at 113:11-21 (JLAP is intended to keep people out of the disciplinary system.); Defs. Exh. 28.

[72] *See, e.g.*, Boudreaux at 53:17–25, 57:24–25 (expressing the view that some or all of LSBA's wellness tweets involve "white noise about nutrition" or "wellness fads," some of which "actually turn out to be not so good").

[73] Pipes at 117:11-14; Larsen at 191:4-8 (acknowledging that the LSBA expends "a very minor amount" of money on the committees that organize the charitable drives, but expends no funds on the gifts or costumes themselves).

eyes of the public."[74] In the alternative, these types of announcements are not a "major activity" of the LSBA, and as such, they do not give rise to a constitutional violation.[75]

Third, plaintiff objects to the LSBA's tweets and press release providing notice of the "69th Annual Red Mass" hosted by the St. Thomas More Catholic Lawyers Association.[76] The LSBA does not fund the Red Mass.[77] The LSBA's provision of notice as to the Red Mass is germane, because the LSBA is alerting its members to an optional event that fosters community in the legal profession. As Robert Kutcher, a former president of the LSBA, testified, "[the Red Mass] is a celebration of the practice of the law. It's a religious holiday, it's not my religion, I understand that. But I think it builds a fellowship; it creates [camaraderie]."[78] In the alternative, the provision of notice regarding the Red Mass is not a "major activity" of the LSBA, and as such, it does not give rise to a constitutional violation.

---

[74] *See* Louisiana Code of Professionalism.

[75] In *McDonald*, the Fifth Circuit concluded that "[m]ost, but not quite all, of the Bar's activities aimed at aiding the needy are germane." 4 F.4th at 250. For instance, the court noted that the Bar's pro bono legal service programs improved the quality of legal services because they made legal services available to those who would otherwise be forced to proceed pro se. *Id.* By contrast, the court highlighted, as the sole example of non-germane activities aimed at aiding the needy, the fact that some bar funds were used to "lobby[ ] for changes to Texas substantive law designed to benefit low-income Texans." *Id.* at 251. The expenditure of bar funds on lobbying for substantive law is significantly distinguishable from the challenged activities in the present case, which consist of the LSBA merely notifying members that they could participate in the charitable drives, there being no expenditure of LSBA funding on gifts and costumes.

[76] Boudreaux at 68:12-19; Defs. Exh. 45.

[77] Pipes at 118:13-25; Kutcher at 164:1-4; Defs. Exh. 48.

[78] Kutcher at 162:10-16.

Finally, the Court addresses several miscellaneous tweets criticized by plaintiff. The Court concludes that tweets regarding technology usage and security practices[79] are germane because they promote attorneys' technological competency and responsible usage of technology.[80] The tweet promoting an article in a non-legal publication regarding public policies addressing student debt[81] is also arguably germane, because student debt is a topic of concern to many lawyers; in the alternative, it does not constitute a "major activity" of the LSBA. Finally, plaintiff criticizes a tweet urging readers to test and change batteries in their smoke and carbon monoxide detectors.[82] The germaneness of this tweet is more tenuous, although it can be argued that it is germane insofar as it encourages lawyers to maintain safe law offices, which serves to protect clients, law office employees, and client records. In the alternative, the tweet does not constitute a "major activity" of the LSBA, and as such, it does not give rise to a constitutional violation.

## 2. Whether the Bar's *Hudson* Procedures are Sufficient

Plaintiff's third claim is that the LSBA's objection procedures fail to ensure that members' mandatory dues are used only for germane activities, in violation of the First and Fourteenth Amendments.

---

[79] *See, e.g.*, September 21, 2021 tweet promoting an article on a non-legal website regarding a purported "outstanding upgrade" in Apple iOS 15. Defs. Exh. 45.

[80] Pipes at 121:19-122:6; *see also* Louisiana Code of Professionalism ("I will use technology, including social media, responsibly."); Louisiana Rules of Professional Conduct, Rule 1.1 (competence), Rule 1.6 (confidentiality).

[81] Defs. Exh. 45.

[82] *Id.*

In *Boudreaux* and *McDonald*, the Fifth Circuit explained that *Keller*, which was decided on freedom of speech grounds, "prohibited bars from using mandatory dues for activities that are not germane," but it also held that "state bars could satisfy their First Amendment obligation toward mandatory dues by adopting procedures to prevent the use of objecting attorneys' dues for non-germane expenses," *Boudreaux*, 3 F.4th at 755 (citing *Keller*, 496 U.S. at 14, 17). The Supreme Court "posited, but did not hold, that the constitutional minimum set of procedures in the union-fee context, set forth in *Chicago Teachers Union v. Hudson*, would likely be adequate in the bar-dues context as well." *Id.* (citing *Keller*, 496 U.S. at 17). The Fifth Circuit then held that *Hudson* sets "the constitutional floor" for procedural safeguards in this context. *Id.* at 758.

*Hudson* provides for an "opt-out" scheme, which requires "a public organization collecting mandatory dues and engaging in non-germane conduct" to have procedures that (1) "include an adequate explanation of the basis for the fee," (2) "a reasonably prompt opportunity to challenge the amount of the fee before an impartial decisionmaker," and (3) "an escrow for the amounts reasonably in dispute while such challenges are pending." *Id.* (quoting *Hudson*, 475 U.S. at 310). "The explanation of the basis of the fee must include 'sufficient information to gauge the propriety of the [ ] fee.'" *Id.* (quoting *Hudson*, 475 U.S. at 306).

The Fifth Circuit further expounded on *Hudson* procedures in *McDonald*, concluding that the Texas Bar's procedures were inadequate, due both to insufficient provision notice and insufficient objection procedures. *Id.* at 254. With respect to

notice, the Fifth Circuit noted that the Texas Bar's procedures were insufficient, insofar as they "place[d] the onus on objecting attorneys to parse the Bar's proposed budget—which only details expenses at the line-item level, often without significant explanation—to determine which activities might be objectionable." *Id.* Additionally, the Bar did not provide members with "any breakdown of where their fees go." *Id.* The Court concluded that this approach was "a far cry from a *Hudson* notice, which estimates the breakdown between chargeable and non-chargeable activities and explains how those amounts were determined." *Id.* (citing *Hudson*, 475 U.S. at 307 & n.18).

When considering whether the LSBA's procedures comply with *Hudson*, as explained in *Boudreaux* and *McDonald*, the Court notes its confusion at the outset. It is difficult to reconcile the Fifth Circuit's adoption of *Hudson* procedures with its holding in *McDonald* as to freedom of association. After all, *Hudson*, as it arose in the context of public-sector labor unions,[83] and as it has been approvingly referenced or adopted in the context of bar associations, is premised on the notion that such organizations can intentionally and affirmatively engage in non-germane activities, so long as they provide sufficient procedural protections for individuals who wish to

---

[83] *Hudson* arose "in the context of a union that affirmatively planned to engage in activities unrelated to collective bargaining for which it could only charge its members." *Crowe v. Oregon State Bar*, 989 F.3d 714, 726 (9th Cir. 2021) (citing *Hudson*, 475 U.S. at 298). While nonmembers could be compelled to finance collective bargaining, they could not be compelled to finance, for instance, the union's political activities. Accordingly, *Hudson* required unions "to provide a detailed statement of fees in advance so that nonmembers could object before being charged for impermissible activities." *Id.* (citing *Hudson*, 475 U.S. at 305–07).

opt-out from financing such activities. However, pursuant to *McDonald*'s freedom of association holding, bar associations can no longer engage in non-germane activities. *Id.* at 252. Under this holding, the First Amendment violation caused by the Bar's non-germane speech cannot be cured through opt-out procedures. *See Id.* at 247.

While *Hudson* clearly continues to be relevant insofar as it requires the provision of some degree of notice with respect to the Bar's activities,[84] several of the more specific features of *Hudson* are difficult to reconcile with *McDonald*'s freedom of association holding. For instance, *Hudson*, as applied in *McDonald*, requires bar associations to provide members with a budgeting breakdown between germane and non-germane activities. *Id.* at 254.[85] However, any bar association that complies with *McDonald*'s freedom of association holding will necessarily classify all of its activities as germane. Indeed, when considering a challenge to the Oregon State Bar Association, the Ninth Circuit observed, "[the Oregon Bar] maintains a policy mandating that dues be used for germane activities . . . . As a practical matter, then, advance [*Hudson*] notice would not have offered additional protection against the

---

[84] The Fifth Circuit has explained that the adequacy of the Bar's procedures continues to be relevant "[e]ven if the plaintiffs cannot be compelled to join the Bar because that violates their freedom of association." Pursuant to "*Boudreaux v. Louisiana State Bar Association*, the inability to identify non-germane expenses is itself a constitutional injury, entitling the plaintiffs to relief. Moreover, because the plaintiffs *can* be compelled to join the Bar if it ceases its non-germane activities, per *Lathrop*, ensuring the Bar has adequate procedures to notify the plaintiffs, and others, that some activities might be non-germane is important." *McDonald*, 4 F.4th at 253 n.41.

[85] The court used the terms "chargeable" and "non-chargeable activities," *McDonald*, 4 F.4th at 254, which arise from *Hudson*'s labor union context, and appear to be equivalent to "germane" and "non-germane," as those terms are used in the bar association context.

alleged constitutional violations because [the Bar] would have characterized all of its activities as germane." *Crowe v. Oregon State Bar*, 989 F.3d 714, 726 (9th Cir. 2021).[86]

Relatedly, the court in *McDonald* also criticized the fact that the Texas Bar required attorneys to "object to a *specific* activity" in order to obtain a refund. 4 F.4th at 254 (emphasis in original). However, in a post-*McDonald* world in which bar associations take the position that all of their activities are germane, it is difficult to conceive of a different approach.

With these considerations in mind, the Court will now determine whether the LSBA's procedures comply with *Hudson/McDonald*. The LSBA clearly complies with *Hudson*'s requirement to provide "a reasonably prompt opportunity to challenge [a disputed fee] before an impartial decisionmaker, and an escrow for the amounts reasonably in dispute while such challenges are pending." *Id.* at 253 (quoting *Hudson*, 475 U.S. at 310). As set forth in greater detail above, once an objection is filed, the *pro rata* amount of the objecting member's dues devoted to the challenged activity is promptly placed in escrow while the Board determines whether to grant a refund based on the objection.[87] Within 60 days, the Board either provides a *pro rata* refund

---

[86] The Fifth Circuit explicitly departed from *Crowe* in holding that *Hudson* requirements are constitutionally required. *See* 4 F.4th at 254 n.45. However, the Court cites *Crowe* insofar as it highlights some of the difficulties that arise when applying *Hudson* in this context.

[87] Defs. Exh. 60. The Court notes that the LSBA's approach with respect to escrow arguably departs from *Hudson*, insofar as *Hudson* contemplated that an organization would prospectively identify nonchargeable (i.e., nongermane) categories of expenses and hold a corresponding amount of funds in escrow until any disputes as to the relevant activities were resolved. *See Hudson*, 475 U.S. at 310; *Schneider v. Colegio de Abogados de Puerto Rico*, 917 F.2d 620, 634 (1st Cir. 1990) (pursuant to *Hudson*, the Bar has an "obligation at the outset of a dues year to categorize its activities so

or refers the matter to arbitration.[88] Historically, all timely objections have resulted in refunds.[89]

The issue of whether the LSBA provides its members with adequate notice of its activities is a closer question. The LSBA notifies members about the adoption of legislative positions via emailed "Bar Briefs."[90] The LSBA also publishes audited annual reports each year providing information on its use of mandatory dues and other revenue,[91] and it has begun to provide prospective budgets for the coming year.[92]

The cover sheet accompanying the prospective budget for 2022-23 states that "[t]he expenditure of funds by the LSBA is limited as set forth in the LSBA's Articles and Bylaws; Supreme Court Rule XVIII § 6; *Keller v. State Bar of California*, 496 U.S. 1 (1990); and *McDonald v. Longley*, 4 F.4th 229 (5th Cir. 2021).[93] It also provides the Treasurer's email address, and advises that members can contact the Treasurer with any questions about the budget.[94] Finally, the cover sheet explains

---

that an escrow amount can be based on actual anticipated expenditures for non-core activities"). However, now that the LSBA maintains a policy of engaging only in germane speech, it is not possible for the LSBA to prospectively identify non-germane expenses. Therefore, this type of escrow requirement "would not further minimize risk of infringement because, unlike in *Hudson*, the allegedly impermissible speech is only identifiable after the fact." *Crowe*, 989 F.3d at 726.

[88] Defs. Exh. 60.

[89] Larsen at 174:23-175:2.

[90] Ponder at 146:6-9; Defs. Exh. 26.

[91] Larsen at 184:16-20; Defs. Exh. 58.

[92] Defs. Exh. 73.

[93] *Id.* at 1.

[94] *Id.*

the objection process.[95] The prospective budget breaks expenses down into categories and sub-categories, to a significant level of granularity. The majority of budget items, e.g., "Telephone," are self-explanatory. However, some, e.g., "LIFT Program,"[96] are not.

The Court recognizes that the Fifth Circuit criticized the Texas Bar for "plac[ing] the onus on objecting attorneys to parse the Bar's proposed budget—which only details expenses at the line-item level, often without significant explanation—to determine which activities might be objectionable." *McDonald*, 4 F.4th at 254. However, in the same paragraph, the Fifth Circuit proceeded to cite the following *Hudson* footnote:

> We continue to recognize that there are practical reasons why absolute precision in the calculation of the charge to nonmembers cannot be expected or required. Thus, for instance, the Union cannot be faulted for calculating its fee on the basis of its expenses during the preceding year. The Union *need not provide nonmembers with an exhaustive and detailed list of all its expenditures*, but adequate disclosure surely would include the *major categories of expenses*[.]

475 U.S. at 307 n.18 (quotations omitted) (emphasis added). Thus, for instance, with respect to "the Union's payment of $2,167,000 to its affiliated state and national labor organizations," the *Hudson* Court required "either a showing that none of it was used to subsidize [nonchargeable activities], or an explanation of the share that was so used." *Id.*

---

[95] *Id.* at 4.

[96] *Id.*

In this case, the LSBA has broken down its budget in substantial detail. The budget coversheet also explains that the budget complies with *McDonald* and invites members with any questions to contact the Treasurer. The LSBA's website also provides substantial detail as to its programming and activities.[97] Accordingly, the LSBA provides members with sufficient notice as to its activities.

Finally, with respect to the post-*McDonald* instances of speech criticized by plaintiff——Tweets, emails, and press releases pertaining to wellness, the Red Mass, and charitable drives—defendants are correct insofar as they assert that the emails, in themselves, provide members with notice as to their contents. On the other hand, while tweets and press releases are publicly available and easily accessible, members would need to take affirmative steps to actively monitor such communications. Plaintiff submits that he should not be forced to constantly monitor such websites in order to stay apprised of LSBA's activities.[98] However, the LSBA "need not provide [members] with an exhaustive and detailed list of all its expenditures." *Hudson*, 475 U.S. at 307 n.18. As explained above, these types of communications are not a major activity of the LSBA. Accordingly, the Court concludes that *Hudson*/*McDonald* do not require the LSBA to directly notify its members of each and every tweet or press release, when such information is readily available online.

---

[97] *See, e.g.*, Defs. Exhs. 10–15, 17, 19, 21, 25, 28–41, 63, 68.
[98] Boudreaux at 16:17-17:5.

## V. CONCLUSION

For the foregoing reasons, a judgment shall be entered in favor of defendants and against plaintiff as to all claims.

New Orleans, Louisiana, August 8, 2022.

_____
**LANCE M. AFRICK**
**UNITED STATES DISTRICT JUDGE**